280 So.2d 362 (1973)
LOUISIANA NATIONAL BANK OF BATON ROUGE
v.
Alfred S. HEROMAN et al.
No. 9367.
Court of Appeal of Louisiana, First Circuit.
May 29, 1973.
Rehearing Denied July 5, 1973.
Writ Refused August 31, 1973.
*364 Edward V. Fetzer, Baton Rouge, for Alfred S. Heroman.
John E. Seago and John C. Anderson, Baton Rouge, for Dan Siegel and Theodore Kristal.
Richard Cheek, in pro per.
John L. Glover and G. Michael Pharis, Baton Rouge, for Louisiana National Bank.
Before SARTAIN, BLANCHE and WATSON, JJ.
BLANCHE, Judge.
This is a devolutive appeal by three defendants who were held liable by the trial court in a deficiency judgment proceeding. Plaintiff, Louisiana National Bank of Baton Rouge, hereinafter referred to as "LNB," instituted an executory proceeding against the maker of a $560,500 promissory note dated March 13, 1969, made by Southern Real Estate Investments, Inc., payable to "Bearer," which promissory note was paraphed for identification with an act of mortgage on immovable property and improvements thereon located in Baton Rouge, Louisiana, executed by Southern Real Estate Investments, Inc., as mortgagor, and accepted by Guaranty Bond and Finance Company, Inc., as mortgagee. The note sued on was further secured by the personal endorsements of, inter alia, defendants-appellants herein, Alfred S. Heroman, Dan E. Siegel and Theodore Kristal. After the mortgaged property had been judicially sold pursuant to the executory proceeding, LNB instituted this suit against, inter alia, the defendants-appellants, to obtain a deficiency judgment. Defendants opposed this suit, claiming invalidity of the executory proceeding, or alternatively, unconstitutionality of executory process, at least as applied herein. The trial court rejected all defenses urged by appellants; we affirm.
Defendants urge that the trial court erred in finding as a fact that the mortgage was executed by the mortgagor and mortgagee in the presence of the notary public and the two subscribing witnesses. This issue of fact was resolved by the trial court in favor of LNB, in accordance with the following reasons assigned by the trial judge:
"The third major area of concern in this case is the contention by the defendants that the act of mortgage was not executed by the parties before a notary public and in the presence of two witnesses thereby destroying its authenticity. The Court will treat this contention along with the further assertion that changes were made in the act of mortgage in such a manner as to destroy its authentic validity.

*365 "This area of the case relates solely to the factual considerations. As the trier of fact, we conclude that the evidence preponderates in favor of establishing that the instrument was signed by both the mortgagor and the mortgagee in the presence of the two witnesses and before the notary. We find that all signatories to the document affixed their signatures thereto in the presence of each other with the notary being the last person to sign." (Written Reasons for Judgment, Record, p. 259)
In reaching this finding of fact, the trial judge indicated further in his Written Reasons for Judgment that he placed great reliance on the testimony of the notary, Mr. Roger M. Fritchie, and on his memorandum of the execution of the note and mortgage which he prepared the day following the signing thereof. The trial judge's resolution of issues of fact, especially those involving the relative credibility to be accorded to the testimony of conflicting witnesses, is entitled to great weight, and will not be disturbed on appeal unless found to be clearly erroneous. From our review of the record herein, we find no manifest error committed by the trial judge in this regard.
Somewhat related to this specification of error is the contention urged by two of the defendants that the trial court erred in holding as a matter of law that the signature of an endorser on the promissory note sued on via executiva did not have to be executed before a notary public and two witnesses before whom the act of mortgage was executed. This contention is without merit, since an endorsement may be added to the promissory note subsequent to the execution of the act of mortgage with which the note is paraphed for identification. No authentic act is required with regard to the promissory note or other instrument evidencing the obligation secured by a mortgage or privilege, for insofar as they are concerned, they are considered to be authentic evidence and self-proving. Louisiana Code of Civil Procedure Article 2636(1) and Official Revision Comment (a) thereto.
Defendants-appellants also assign as error the determination by the trial court that there was a proper acceptance of the mortgage by the corporate mortgagee, defendants arguing that the mere signature of an agent of the mortgagee, without authentic evidence of authority of the agent to accept the mortgage, results in an absence of requisite authentic evidence and renders null and void the executory proceeding. These contentions are likewise without merit. In this regard we quote approvingly the trial judge's reasons for judgment disposing of these same contentions:
"We reject also the contention that the signature of Louise Thompson as agent for Guaranty does not suffice in the absence of an authentic act of power of attorney. It is argued that the statement contained in the act of mortgage is not sufficient, that authentic evidence must be submitted in the foreclosure proceedings to show that Louise Thompson was in fact authorized to appear as agent of Guaranty. Federal Land Bank v. Hall, La.App., 171 So. 418 (1936), interpreting mortgage language dealing with the acknowledgment of note receipt by an agent, held:
`This reveals that the said Lewis was acting as agent for the Federal Land Bank in the execution and acceptance of the mortgage, to the knowledge of the mortgagor. This agency relationship was confirmed and approved by the filing of this suit. In view of this, and as the act of mortgage was authentic in form, we hold that authentic evidence of acceptance existed.'
We think it clear that no separate authority is necessary, other than the signature of the agent in the appropriate place on the authentic act of mortgage. If affirmative action was necessary, as *366 argued by the defendants, on the part of Guaranty confirming and approving the agency relationship of Louise Thompson, it is found in the subsequent negotiation of the note and mortgage by Guaranty to LNB in exchange for the latter's funding of the transaction. There can be no doubt that Guaranty `confirmed and approved' the agency relationship of Louise Thompson and the acceptance by her in its behalf of the note and mortgage. Accordingly, Federal Land Bank v. Hall is applicable hereto and stands for the proposition that no separate authentic act is necessary to establish the agency of Louise Thompson." (Written Reasons for Judgment, Record, pp. 260-261)
Defendants further assign as error the finding of fact by the trial judge that there was no variance between the act of mortgage and the note for purposes of the executory proceeding. Alternatively, the defendants urge that the mortgage cannot be altered and still constitute an authentic act, even if the mortgagor assents to the alteration. The trial judge resolved in favor of LNB this issue of fact for the following reasons, which we find from our review of the record not to be manifestly erroneous:
"The contention that changes in the language of the act of mortgage were made after the mortgagor, through Dan E. Siegel, affixed its signature is likewise without merit insofar as authenticity being adversely affected. Construed in its entirety and given a reasonable interpretation, the evidence refutes this contention. Mr. Fritchie testified that all changes were made and the mortgage was put in final form before he executed it. Even if the changes were made after Siegel signed the act, he was present, knew what was being done and could have objected to the changes. Had he objected, the notary would not have signed the act. The fact that the act of mortgage was executed and then relied upon by Southern indicates to the Court that either Mr. Siegel signed the act after all changes were made or he did not object after seeing the changes in which case the Court deems his silence as approval. Emphasis has been placed by the defendants upon the apparent differences among various copies of the mortgage. These differences have been satisfactorily explained to the Court. Brevity dictates some limitation to this area of discussion and we conclude it by holding that there was no procedural defect in the execution of the act of mortgage as an authentic instrument." (Written Reasons for Judgment, Record, p. 260)
As to the aforementioned alternative contention by defendants, we hold that if the mortgage instrument is altered to conform with the intent of the parties and such alterations are assented to by the parties in the presence of the acting notary, the notarized mortgage constitutes an authentic act and is authentic evidence for purposes of executory process.
Defendants further assign as error the holding by the trial court that the corporate resolution dated March 15, 1969, or two days after the execution of the note and mortgage on March 13, 1969, constituted satisfactory authentic evidence so as not to render null and void the executory proceeding. We believe the trial judge properly resolved this issue in favor of LNB in the following manner:
"Turning now to the various alleged defects in the authenticity of the evidence upon which LNB relied for executory proceedings, we consider first the contention of the defendants relative to the absence of a resolution authorizing Siegel to act for Southern at the time of mortgage execution; and, the contention that, assuming an existing resolution at the time of execution, or a later one which would have the effect of ratification, it must nevertheless contain specific authority for the agent to confess judgment.
"As above stated, when the mortgage was executed, March 13, 1969, there was *367 no resolution authorizing Siegel to act. We are convinced, in our own mind, that Siegel was in fact authorized to execute the note and mortgage the evening of March 13, 1969. We base this conviction upon Mr. Siegel's demeanor and response at trial to a question posed by the Court. When asked if he had come to Baton Rouge without authority to sign the note and the mortgage, Mr. Siegel replied: `I'll have to check with my counsel.' Nevertheless, there was in fact no existing written resolution at the time of execution. It was passed two days later and recited:
`BE IT RESOLVED that Dan E. Siegel ____ be and he is hereby authorized to borrow money ____ not exceeding ____ ($350,000.00) ____ on such terms and conditions as he may approve, and to agree to and execute a discount loan note in the face amount of ____ ($560,500.00), which said acts are hereby ratified ____, and he is further hereby authorized ____ to secure the payment of such loan ____ by mortgaging ____ the Heidelberg Hotel ____.
`BE IT FURTHER RESOLVED that Dan E. Siegel ____ be and he is hereby authorized to make and execute such mortgages _____ in respect to securing said indebtedness now or hereafter existing as may be required by either or both of the aforementioned lenders, or as may be expedient or legal.' (Emphasis by this Court)
"From the foregoing language there can be little doubt that Southern intended to expressly ratify the action taken by Siegel two days earlier, including the execution of both the note and the mortgage. Further, the language is sufficient to ratify a mortgage containing a confession of judgment. Admittedly, the authority to confess judgment is not express. Taken as a whole, however, the tenor of the document is clear. It was intended that Siegel's acts be ratified, including the making of `such mortgages' to secure indebtedness `now or hereafter' existing. Considering the fact that the mortgage already executed was one to secure a future advance of funds, the `now or hereafter' phrasing becomes meaningful and clarifies the intent of the document. Further, absent some statutory or well founded jurisprudential rule to the contrary, the concluding language of the resolution, above quoted, recognizes and acknowledges that should the mortgagee require a confession of judgment in the mortgage, Siegel could agree to same. It was certainly both expedient and legal to include it in the mortgage. We might add such inclusion is entirely customary in the State of Louisiana and is uniformly required by lending institutions.
"According to the French authorities, Planiol & Ripert, Volume 2, Part 2, Section 2255:
'Everything which is done by the mandatary beyond the terms of his procuration can, however, be ratified by the principal, and then the will of the latter obligates him to the third person as if there had been a prior mandate: OMNIS RATIHABITIO RETROTRAHITUR, ET MANDATO PRIORI AEQUIPARATUR. (Every ratification relates back and is equivalent to a prior authority.) This ratification can be express or tacit (Art. 1998, par. 2). The acts which constitute tacit confirmation are determined by the judge.'
"Our jurisprudence supports the theory that subsequent ratification is retroactive in effect and equivalent to prior authority. The general rule is found in the early case of Grove v. Harvey, 12 Rob. 221 (1845) wherein it was stated:
`It is true, as a general rule, that a subsequent ratification gives validity to an unauthorized act of a negotiorum gestor, and that the maxim above quoted ("omnis ratihabitio retrotrahitur, et mandato priori aequiparatur.") generally applies. It has, when fairly made, the same effect as an original authority to bind the *368 principal, and our Code is explicit upon this subject.'
"See also, Acadian Production Corp. v. Savanna Corp., 222 La. 617, 63 So.2d 141 (1953), citing Grove v. Harvey, supra, as authority for its conclusion that subsequent ratification by a corporation is retroactive in effect and equivalent to prior authority.
"The principle was again applied in J. B. Levert Co., Ltd. v. John T. Moore Planting Co., Ltd., 139 La. 792, 72 So. 249 (1916). This case is especially significant since it dealt with an appeal from an order of executory process. Its holding relates both to the retroactive effect of a ratification and the use of such ratification in executory proceedings. At pp. 250, 251 of the opinion we find:
`This is an appeal from an order of seizure and sale directed against several large sugar plantations. The only question before us is whether there was sufficient authentic evidence presented to the judge below to authorize the fiat.
`The act of special mortgage, purporting to have been executed by the John T. Moore Planting Company, Limited, per J. Austin Moore, vice-president, in favor of the J. B. Levert Company, Limited, was passed before a notary public and two witnesses and therefore is in due form. All the notes described in the act of mortgage are identified therewith by the paraph of the notary. But there was not presented to the judge a quo a copy of any resolution of the board of directors of the John T. Moore Planting Company, authorizing J. Austin Moore to execute said mortgage. It is however, argued by counsel for the plaintiff that this omission was supplied by other authentic evidence presented to the judge, showing that the said vice-president was so authorized, or at least that the execution of the mortgage had been ratified, approved, and adopted by the John T. Moore Planting Company.
`This important supplemental contract is held up by counsel for defendant as a mere recognitive act, without legal effect, because the tenor of the original act of mortgage was not therein set forth. As we have in the record before us copies of the original act of mortgage, and of the supplemental contract, "the primordial title" has been produced, and C.C. Art. 2271, has no application. The difference between referring to and supplying a prior title or contract is obvious.
`If the vice-president of the Moore Company had no special authority to execute the original mortgage, the authentic contract of February 2, 1912, shows that said company voluntarily executed its obligations under the original contract, reaped its fruits, and adopted it as its own. Every ratification has the legal effect of an original mandate.'
"From the evidence in the instant case, it is easy to discern that Southern likewise voluntarily executed its obligations under the act of mortgage, reaped its fruits, and adopted it as its own. It acknowledged and approved the disbursement of the $350,000.00 for its benefit, using the bulk of the proceeds to acquire title to the property in question.
"In another Supreme Court case, American Trust Co. v. Crescent Ice Co., 133 La. 247, 62 So. 664 (1913), there was an appeal from executory process in which no resolution authorizing the execution of the mortgage on behalf of the mortgagor was in evidence, but a subsequent resolution by the corporate mortgagor, authorizing and approving the foreclosure, was submitted to the judge authorizing the executory proceedings. The Court stated, at page 666:
`Regarding the executory process resorted to, appellant's objection is that there is no authentic proof of the president's authority to execute the mortgage. To this it suffices to state that the resolutions passed by the board of directors, approving the foreclosure proposed, can be considered authority. At this meeting the appointment of the receiver was ratified, also the seizure.'
*369 "It is indeed arguable that ratification cures any defect in a plaintiff's substantive right to pursue his claim to judgment, but cannot cure a purely procedural defect of form. For instance, had LNB sued by ordinary process there would be no question that a ratification of Siegel's acts would have effectively bound the corporation for which he acted. It is more problematical whether a defect in a step of procedure may be cured by ratification, especially when it concerns the very harsh procedural remedy of Executory Process.
"Nevertheless, the court feels that after considering the holdings of the Levert and Crescent Ice Co. cases, supra, it is under an obligation to follow the mandate of the Supreme Court and to hold that the subsequent ratification by Southern of Siegel's act of executing the note and mortgage complied with C.C.P. 2636 (4) and R.S. 13:4103 and provided the necessary authenticity for LNB to proceed by Executory Process. Our conclusion on this point is reached only after reviewing the many cases cited in opposition by the defendants and finding them not supportive of their position.
"In support of the contention that express authority had to be contained within the resolution to authorize Siegel to confess judgment, defendants cite the case of Boykin v. O'Hara, 6 La.Ann. 115 (1851). The case is simply not authority for that proposition and has no applicability here. It dealt with a power of attorney `to perform all such acts as may be necessary for the proper management of the plantation.' The agent was generally authorized `to perform any act necessary for the well being and security of the said property, to wit, to contract any debts necessary for the support and use of the said plantation.' No conventional mortgage was involved in the Boykin case. The agent had confessed judgment as against his principals in a suit resulting from the nonpayment of a draft issued by one of the principals. This act, the Court held, exceeded the agent's authority. The Court also found that such a confession of judgment went far beyond a mere mortgage since it placed the defendant thus subjected to a recorded judicial mortgage which was much more onerous than a conventional mortgage covering only part of his property. It must be emphasized that the confession of judgment referred to in Boykin resulted in a judicial mortgage against all of the principal's property. It was not a confession of judgment for purposes of executory process against a specific, described, piece of real estate. By contrast, we note that the resolution at issue herein, by its express language authorizes Siegel `on behalf of this corporation to secure the payment of such loan or loans by mortgaging and pledging all of its rights, title and interest in a certain piece of property located within the City of Baton Rouge, State of Louisiana, commonly known as the Heidelberg Hotel and more particularly described as Lot 5, Square 2, Hickey, Duncun & Mather Town, East Baton Rouge Parish', etc.
"We can find no legal authorities supporting defendants' contention that the resolution was authentically defective because it lacked an express mandate for Siegel to confess judgment. As above outlined, the language of the resolution is sufficient to vest that authority in Siegel without it being spelled out." (Written Reasons for Judgment, Record, pp. 251-256)
The trial court properly concluded that the duly enacted resolution by the corporate mortgagor, which was submitted to the trial court in conjunction with the institution of the executory proceeding, clearly demonstrated the corporate mortgagor's ratification or authorization after the fact of the execution of both the note and the mortgage by its president, Dan E. Siegel. We cannot accept defendant's contention that the corporate resolution must be prospective in nature and terminology so that unless a corporate resolution exists prior to the time of the execution of a note and mortgage, the payee or bearer of the mortgage note will not be able to resort to executory process, notwthstanding the presentation *370 to the court at the time of instituting the executory proceeding of a resolution of the corporate mortgagor expressly ratifying the incurrence of the debt and mortgaging of collateral therefor. The only purpose of the corporate resolution is to confirm the intent and willingness of the corporation to incur the obligation or indebtedness. The "authorization" in that regard can be proven by authentic evidence of a corporate resolution to that effect, either prospective or retrospective in nature and terminology.
Defendants further complain in this regard that the resolution enacted by the corporate mortgagor two days after the execution of the note and mortgage constitutes only a ratification of the act of the corporation's president's borrowing of the money and execution of the mortgage note, and does not likewise constitute ratification of his executing the mortgage itself securing the note. We find no merit in this suggested distinction, since a review of the resolution in question obviously demonstrates that the whole tenor of the resolution was to authorize, or more technically to ratify, the loan and mortgage note which had previously been executed, and it would tax beyond any reasonable form of construction to interpret the resolution in question as merely prospectively authorizing the corporation's president's prospectively securing the indebtedness "by mortgaging * * * the Heidelberg Hotel [immovable property and improvements thereon]" instead of ratifying the mortgage executed by the corporate mortgagor's president two days before the enactment by the corporation of the resolution in question. This resolution was properly held to constitute whatever authentic evidence was required to establish the intent of the corporate mortgagor to be fully bound by the acts of its president in borrowing the money, executing the mortgage note and executing the accessory mortgage securing the same.
Defendants further assign as error the trial court's holding that LNB could properly proceed via executiva against the defendants where there was a bearer note and a mortgage securing the same payable to a specific mortgagee and no authentic evidence of any assignment of the mortgage to LNB. These arguments were properly disposed of by the trial judge in the following manner:
"Taking up still another point at issue in this case, we now consider the alleged necessity for the transfer of the note and/or mortgage to be by authentic act before LNB could validly proceed via executiva. Counsel for Heroman urges:
`It may be true that the transfer or negotiation of a note carries with it the accessory, the mortgage, but that fact alone does not afford the transferee the right to resort to executory process.
`The Court, when issuing the order for executory process, can not entertain any evidence en pais, in other words, outside the evidence placed before the Court. Such evidence must be self-proving or authentic in every respect.
`The assignee or transferee of a negotiable note (as a substantive matter) may be in a position to be a holder in due course, and the note may carry with it the accessory, the mortgage, in order to enable the holder to sue to have the mortgage recognized against the property in ordinaria [via ordinaria]. However, before such an assignee or transferee of the note and mortgage could proceed via executiva, each and every muniment and chain of his title must be supported by authentic evidence of the transfer.'
"As previously alluded to, this precise point was covered in Universal C.I.T. Credit Corporation v. Spring, supra. Not only is this 1970 rendition of the First Circuit adverse to the defendants herein on the immediate point under discussion, but it covers a situation strikingly similar in several aspects to the instant *371 matter without any relief to the defendants herein.
"In Spring, as here, it was expressly contended that an assignment of the note in authentic form was vital to the executory proceedings. The Court, through Judge Blanche, treated the contention thusly:
`Inasmuch as the note sued upon and admittedly executed by Spring is properly classified as bearer paper, Universal C.I.T. as the holder and bearer thereof could properly institute the executory proceedings and enforce the principal obligation which had been delivered to it by the seller of the vehicle and likewise enforce via executiva the accessory obligation represented by the chattel mortgage which followed the principal obligation, General Contract Purchase Corporation v. Doyle, cited supra. The executory proceeding and seizure and sale being valid, Universal C.I.T. could and did properly proceed against Spring for a deficiency judgment, the sale having been with appraisement, Louisiana Code of Civil Procedure Article 2771.'
"Defendants cite the case of Lee v. Dearmond, 4 La. 320 (1832), in reliance upon their contention that authentic evidence of the transfer of the bearer note and of the mortgage is required for executory proceedings. Lee v. Dearmond was overruled by the Supreme Court of Louisiana in Louis Mathe v. George McCrystal, 11 La.Ann. 4 (1856). See also Gaines v. Bonnabel, 168 La. 262, 121 So. 764 (1929); Nolen v. Davidson's Succession, La.App., 190 So. 826 (1939); Scarborough v. Duke, La.App., 251 So.2d 55 (1971); L.R.S. 7:30; C.C.P. Arts. 2535 and 2536; and, 16 Tulane Law Review 630." (Written Reasons for Judgment, Record, pp. 261-262)
Defendants seek to draw a distinction between (1) a mortgage note which is made payable to the order of the mortgagor and by him endorsed in blank and the act of mortgage so recites, in which case it has been uniformly recognized that no authentic evidence of the transfer or assignment by the mortgagee is required, and (2) the situation which obtains in the instant litigation; namely, a mortgage note made payable to "Bearer," and the mortgage instrument so recites, in which situation defendants contend there must be authentic evidence of the transfer or assignment by the mortgagee. We fail to see any distinction whatsoever between the two situations, as in each instance, the mortgage note constitutes "bearer paper" and as stated in Universal C.I.T. Credit Corporation v. Spring, 242 So.2d 73 (La. App. 1st Cir.1970), application not considered, 258 La. 560, 246 So.2d 863, such instrument is transferred merely by delivery, and the act of mortgage, which is an accessory thereto, follows such transfer. Further authority in favor of the trial court's resolution of this issue is the case of First National Bank of Lafayette v. Gaddis, 250 So.2d 504 (La.App. 3rd Cir. 1971). In neither situation need there be any authentic evidence of the assignment or transfer for purposes of permitting the bearer to institute an executory proceeding.
Defendants-appellants further assign as error the trial court's finding as a fact that the promissory note involved in this litigation was, in fact, negotiated by the named mortgagee, Guaranty Bond and Finance Company, to plaintiff, Louisiana National Bank. We find no manifest error committed by the trial court in its resolution of this issue of fact, which was resolved in favor of LNB for the following reasons:
"Several different viewpoints were expressed by various witnesses with respect to the proper legal interrelationship of Southern, Guaranty, and LNB. Conflicting versions were offered the Court as to who was the first holder of the note, as to the function of the various individuals involved, and as to the role each party *372 played in the transaction involving the note and mortgage. Such confusion needs to be dispelled and, in so doing, the defense of absence or failure of consideration as well as the defense that the defendants herein are not makers of the note will be overcome.
"Mr. Thomas L. Pitchford, vice-president of Guaranty, testified that Guaranty never owned the mortgage note. He stated his firm never had possession of the note and never paid any consideration for the note. He did, however, admit that he did not know whether Mrs. Thompson held the note for Guaranty. It was his belief that Mr. Fritchie, as closing attorney, acted on behalf of both LNB and Guaranty. He testified further that LNB knew that Guaranty was not advancing any money and was only lending its credit via the take-out commitment.
"Mr. William A. Lanfer, the former vice-president of LNB who handled and serviced the loan, testified that LNB was making a loan direct to Southern. He did not consider that LNB was purchasing a negotiable instrument on the open market from Guaranty.
"Mr. William H. McClendon III, attorney representing LNB when the funds were advanced and the note acquired, testified it was LNB's position that the loan was being closed by Guaranty through Guaranty's attorney (Fritchie) and the note was then being transferred to LNB. According to McClendon, LNB was relying upon the take-out commitment and the mortgagee title policy. He further stated that on April 3, 1969, he was purchasing for LNB a note from the holder who was Guaranty. He viewed Mr. Fritchie's role as counsel representing Guaranty and noted that payment of the $350,000.00 was to Guaranty through their said attorney.
"Mr. McClendon acknowledged that a banker's view of such transactions is often different from that of counsel who has a legal viewpoint. He explained that while LNB may have felt it was loaning money to Southern, that he, as their counsel, was thinking in terms of Guaranty closing the loan and then the note would be transferred to his client with a take-out commitment for $350,000.00. McClendon added that he further relied on the fact that the loan had been closed by Fritchie with a valid note and mortgage available. Interestingly, he noted that the parties (Southern and Guaranty) acknowledged in an authentic act that consideration was paid and received and, therefore, he did not consider the question of original lack of consideration for the note.
"Mr. Roger M. Fritchie testified that LNB wanted a `pre-closed loan' with a takeout commitment and a title policy. It was his understanding that he closed the loan on March 13, 1969, for LNB, with a side deal that Guaranty would buy the note in the future. He also acknowledged that the closing on March 13, 1969, was for whatever use the note and mortgage may have in future commerce. Fritchie asserted that there was no intent on the part of Guaranty as of March 13, 1969, to loan money to Southern or the defendants herein.
"Resolution of the foregoing viewpoints into a technically correct legal posture was accomplished by counsel for plaintiff and we take the liberty of adopting the following language from his brief:
`The aforesaid documents, together with the testimony of Tom L. Pitchford, William A. Lanfer, and other witnesses, makes it clear that the legal effect of the series of transactions that occurred between Southern Real Estate Investments, Inc., Guaranty Bond & Finance Co., Inc., and Louisiana National Bank of Baton Rouge, was that Guaranty was the real mortgagee, and that there was "delivery" of said bearer note to Guaranty so as to constitute Guaranty a "holder" of said bearer note under the definitions of *373 these words in R.S. 7:191, which provides in relevant part:
"`Delivery' means transfer of possession, actual or constructive, from one person to another.
"`Holder' means the payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." (Emphasis added)
`On the face of said authentic act of mortgage, it appears that Louise Thompson, acting as Guaranty's agent, accepted delivery of said bearer note on behalf of Guaranty, and acknowledged receipt thereof. This recitation is confirmed by the testimony of Louise Thompson and of the Notary, Roger M. Fritchie, each of whom testified that Louise Thompson was present and did execute said acceptance of the note and mortgage before the Notary and two witnesses. Tom L. Pitchford, vice-president in charge of mortgage operations of Guaranty, and who had personal knowledge of this particular transaction, testified that said Roger M. Fritchie customarily handles such transactions for Guaranty in East Baton Rouge Parish, and that Louise Thompson, Mr. Fritchie's secretary and bookkeeper, customarily appears and accepts mortgage notes and mortgages on behalf of Guaranty and is authorized to do so, although he knew of no specific written authority to that effect.
`The physical execution of the note and mortgage and their acceptance on behalf of Guaranty was accomplished on March 13, 1969. At that point, according to the testimony, not all of the conditions necessary for the funding of this transaction had been completed. However, the record clearly establishes ample consideration to support the issuance of the note and the execution of the mortgage in the form of mutual promises. Representatives of Southern Real Estate Investments, Inc., had earlier applied to Guaranty and to LNB for a loan to finance the purchase of the Heidelberg Hotel, but LNB refused to fund the transaction without Guaranty's take-out commitment. To enable Southern Real Estate Investments, Inc., to obtain the desired funding, Guaranty sold or loaned its own credit in the form of the take-out commitment (Exhibit P-18), accepted the note and mortgage on March 13, 1969, through its agent, Louise Thompson; and, in effect, promised it would not place the note in commerce or record the act of mortgage until the funding was complete, by causing the note and mortgage to be held in trust by the Notary pending such funding. For its part of the mutual promises, Southern Real Estate Investments, Inc., obligated itself to pay the $560,500.00 face amount of the bearer note dated March 13, 1969; agreed to mortgage the Heidelberg Hotel to secure the obligation evidenced by said note; and agreed to pay Guaranty a $14,000.00 fee out of the proceeds of the funds to be advanced by LNB.
`The testimony clearly reveals that the Notary, Mr. Fritchie, did in fact hold the note and mortgage in his custody from March 13, 1969, until April 3, 1969, the date on which the funding was completed. It further reveals that, during that same period, Mr. Fritchie acted as Guaranty's attorney in working out the provisions of the take-out commitment with LNB's attorney, William H. McClendon.
`Subsequently, on April 3, 1969, LNB, acting through William A. Lanfer, delivered to the Notary, Mr. Fritchie, a bank check for $350,000.00 and, the funding having been accomplished, the Notary, Mr. Fritchie, caused the act of mortgage to be recorded, and then delivered to LNB the original note, a certified copy of the act of mortgage, the take-out commitment identified as P-18, and a mortgagee title insurance policy in which the name of LNB appears as an insured along with Guaranty.'
The foregoing constitutes the legal anatomy of a `pre-closed' loan with a take-out *374 commitment. The structure is not in conflict with the law applicable to contracts, negotiable instruments and security devices. As between Southern and Guaranty, there was consideration for the initial issuance of the note and for the execution of the act of mortgage. And, of course, there can be no denial of the fact that LNB gave value for the note when it acquired same. R.S. 7:26 provides:
`Where value has at any time been given for the instrument, the holder is deemed a holder for value to all parties who became such prior to that time.'
Technically, the $350,000.00 was paid to Guaranty for the note and legal effects ensued therefrom. In reality, the funds were intended for and were received by Southern. The fiction attendant to the procedure does not invalidate the transaction. There has been no absence of or failure of consideration as between Southern and Guaranty on the one hand and as between Guaranty and LNB on the other hand.
"Now, insofar as the defendants herein are concerned, they are legally bound for the indebtedness represented by the note without regard to whether they personally received any consideration. R.S. 7:29 provides:
`An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party.'
The defendants herein are correct when they contend they are not makers of the note. However, they are accommodation parties. They signed as indorsers, without receiving value therefor, and for the purpose of lending their names to Southern. As such, they are liable to LNB, as a holder for value, in accordance with the terms and conditions of the note." (Written Reasons for Judgment, Record, pp. 264-268)
Defendants assign as further error committed by the trial judge his allowing evidence of a debt to plaintiff, Louisiana National Bank, which was not allegedly authentic, to be the basis of an executory proceeding. Again, we feel the trial judge properly resolved this issue adversely to defendants for the following reasons:
"The next point to be covered is the contention of the defendants that authentic evidence of the existence of a debt must be submitted to the judge and it was not done so in this case. In support of this position, the case of American Budget Plan, Inc. v. Small, La.App., 229 So.2d 190 (1969) is cited.
"At first blush it appears that American Budget Plan is on all fours with the instant case. However, close scrutiny of the case convinces us that it is not applicable under the facts of this case. We have no quarrel with the statement found therein at page 193:
`Certainly, proof of the existence of a debt on which the suit is based is a link in the chain of evidence necessary to justify executory proceedings; without an obligation on the part of the alleged debtor the alleged creditor would have no action at all.'
"Continuing, the Court held:
`As the only authentic evidence offered by the plaintiff relative to the existence of a debt is incorrect, the record is devoid of any evidence in authentic form showing that a debt in fact existed. Authentic proof of the existence of a debt being necessary and absent, plaintiff cannot use executory process; it must be relegated to the use of an ordinary proceeding.' (Emphasis by this Court.)
"However, in this case the authentic evidence relative to the existence of a *375 debt (the note given by Southern in the amount of $560,500.00) is correct. We are dealing here with a discount note enforceable for its face amount, subject only to rebate under the rule of Berger v. DeSalvo, supra. The note bears interest only after maturity. Had it not been optionally matured by the maker due to default the entire sum of $560,500.00 would have been due and payable and would presumably have been paid by the maker. At least, the maker would, at final maturity, have been obligated therefor.
"To the contrary, in American Budget Plan, there was never a debt for a fixed and certain amount. A note was given for $8,500.00 but it was an incorrect amount. The maker was never obligated for that sum. Evidence in that case discloses that it was uncertain as to what amount would ultimately be advanced and, therefore, due on the note. The note was, significantly, not a discount note (interest included) but bore interest from its date, indicating an advance of money or the incurrence of indebtedness at the time of issuance.
"There are many other factual differences between the American Budget Plan case and the instant matter. Here, the note was payable to bearer; there, it presumably was payable to the plaintiff. Here, one payment of $350,000.00 was advanced for the note by one other than the original holder; there, the original holder advanced sums from time to time to the maker and a third party jointly, with the amounts and the time of payment being unknown in advance. Here, the installments due on the note were fixed and certain; there, it was understood that scheduled installments would not be due or paid until after certain construction work was completed. Here, the record bears no discrepancies due to the discount nature of the note (the difference between the $560,500.00 and the amount sued for is correctly explained on the basis of our law); there, it was impossible to reconcile an $8,500.00 interest bearing note, subject to no credit whatever, with a demand for $4,768.79. Lastly, the record here includes a full and legally correct explanation of the principal balance due on the note, whereas, in American Budget Plan, `No statement relative to the principal balance due was in fact attached to or filed with the petition,' although the petition recited, `The note is subject to a credit on the principal of -0-, leaving a principal balance of $4,768.79, with interest at the rate of Eight per cent (8%) from date, as will more fully appear by reference to statement attached hereto and made part hereof ....'
"American Budget Plan signally holds, page 193:
`We also note a material difference between this case and those in which there are disputes involving the amount remaining due on the debt; a sale by executory proceedings cannot be enjoined because of such disputes; the sale is made to satisfy the undisputed or actual debt. See Mayfield v. Nunn, 239 La. 1021, 121 So.2d 65; Crowley Bank & Trust Co. v. Hurd, 137 La. 787, 69 So. 175; Berger v. Burglass (DeSalvo), La.App., 156 So. 2d 323. In those cases involving such disputes there is authentic proof of the existence of a debt.' (Emphasis by Court.)
"Focusing on the cited cases, we find them factually not unlike this case. All three involve executory proceedings wherein evidence other than the note itself is construed to determine the amount due without rendering incorrect and, thereby, non-authentic said note. Particularly, in Mayfield and Berger, discount notes were involved. The actual advances therein were less than the face amount of the note. The plaintiff in this case relied upon Berger to compute the correct indebtedness, but the case also affords relief to plaintiff from *376 the defendants' attack on non-authenticity of the evidence of debt. Correlating Mayfield, Berger and the instant case, with the structuring of conventional mortgages as outlined in Thrift Funds Canal, Inc. v. Foy, supra, the result equates to a finding of authentic evidence of indebtedness herein. If one were to follow the reasoning of the defendants in this case, the use of executory process would be completely ruled out in all cases where discount notes issued in connection with preclosed loans, or otherwise, are negotiated on the open market. We do not think the American Budger Plan case was intended to stand for that proposition. It certainly seems to imply that the Court can look beyond the note itself to determine if it is authentic evidence of the basic indebtedness. Also, the case expressly approves Mayfield, Crowley Bank and Berger, stating: `In those cases .... there is authentic proof of the existence of a debt.' See also C.C.P. 2637." (Written Reasons for Judgment, Record, pp. 256-259)
Defendants further contend that the trial court erred in allowing recovery in the executory proceeding for interest, taxes, attorneys' fees and other costs in the absence of authentic evidence of said items. This contention is likewise without merit, and we again quote approvingly the trial judge's Written Reasons for Judgment in disposition thereof as follows:
"The final onslaught of the defendants upon the authenticity of the evidence used by LNB for executory process relates to interest, stipulated damages, and alleged variances between the note and mortgage. Defendants urge that interest and all stipulated damages must be proved by authentic evidence; and, that there are variances between the note and mortgage which render them non-authentic. There is no merit in these contentions.
"Disposing of the last contention first, we find no variances in the documents before us. While the act of mortgage does not refer to the endorsements on the back of the note, such is unnecessary and oft times impossible since endorsements are generally added to promissory notes after they are secured by a mortgage. The addition of endorsements to a note has nothing to do with foreclosure by executory process. Particularly, the note in question being a bearer note negotiated by mere delivery, none of the endorsements thereon are necessary to LNB's title. Under L.R.S. 7:48, LNB could have stricken all endorsements from the back of the note without affecting its title or right to use executory process. A careful reading of the note and mortgage discloses that they are otherwise compatible in language, and legally sufficient with no significant variances.
"It is difficult for this Court to follow the argument that there was a lack of authentic proof for the interest and stipulated damages demanded by LNB. For the purpose of a writ of seizure and sale it was only necessary that LNB allege in its verified petition the amount of the indebtedness, including such items. As we have already seen in American Budget Plan v. Small, supra, a sale by executory process cannot be enjoined because of a dispute involving the amount remaining due on the debt. The sale is made to satisfy the undisputed or actual debt. Even where there are disputes as to the amount due, there is authentic proof of the existence of a debt. The defendants herein can now contest the amount of interest due or any other item of indebtedness but such a dispute has nothing to do with authentic evidence for foreclosure purposes. Our previous discussion of the nature of discount notes and the effect of the rule set forth in Berger v. DeSalvo, supra, while pertinent, need not be repeated. Note also C.C.P. Art. 2637, as amended by Act 4 of 1964." (Written Reasons for Judgment, Record, pp. 262-264)
*377 The note on which defendants' names appear as endorsers contains an express provision specifically making applicable thereto and binding, inter alia, on the endorsers, all pertinent provisions of the act of mortgage paraphed for identification with the mortgage note:
"The makers and endorsers hereof hereby take cognizance of and agree to be bound by the provisions, conditions, stipulations, penalties and attorney fees recited in the Act of Sale and/or Mortgage with which this note is identified; severally waive presentment for payment, demand, protest, notice of protest and non-payment, and all pleas of division and discussion, and agree that this note may be extended without notice or further consent, obligating themselves IN SOLIDO unconstitutionally for the payment hereof in principal, interest, costs and attorneys fees." (Plaintiff's Exhibit-1)
The act of mortgage referred to contains the requisite provisions relative to all of these items, thereby obligating defendants as specifically provided for in the mortgage note which they endorsed, in accordance with the provisions of the act of mortgage itself.
Defendants further argue that inasmuch as the mortgage note endorsed by them does not contain per se a confession of judgment provision, and further, since the endorsers did not sign the mortgage, the trial judge erred in holding that the defendants, by merely endorsing the note, consented to confession of judgment for purposes of executory process. This specification of error is likewise without merit, again for the reason that the confession of judgment provision is specifically contained in the act of mortgage, which provision is, in turn, by the very terms of the mortgage note endorsed by the defendants specifically made applicable as an obligation attendant thereto. There is no requirement that the mortgage note itself contain a confession of judgment provision in order to be the basis of a valid executory proceeding. If the endorsers to the mortgage note obligate themselves and accept the provisions of the act of mortgage which is paraphed for identification with the mortgage note, such endorsers are bound accordingly.
Defendants further urge that no deficiency judgment can be rendered against them inasmuch as the mortgaged property was sold at the second offering for less than two-thirds of its appraised value, even though the executory proceeding instituted by LNB prayed for sale with appraisement. This specification of error is likewise without merit. The trial judge disposed of these contentions in the following manner:
"The final defensive allegation with which we shall concern ourselves is to the effect that the foreclosure proceedings are invalid as being equivalent of a sale without appraisement, or because the property was sold at the second offering for less than two-thirds of the appraisement. This novel interpretation finds no support whatsoever in our law. Applicable authorities are C.C.P. Arts. 2771, 2723, 2336 and 2337; and, R.S. 14:4106. See also Milburn v. Proctor Trust Co., 32 F.Supp. 635 (WD La.1940), affirmed in 122 F.2d 569 (5th Cir. 1941). The facts, already sufficiently outlined hereinabove, are such that the provisions of law noted preclude any result other than that of a valid sale, with appraisement, thereby entitling plaintiff to pursue a deficiency judgment. The bed rock provision of C.C.P. 2336 provides:
`The property shall not be sold if the price bid by the highest bidder is less than two-thirds of the appraised value. In that event, the sheriff shall re-advertise the sale of the property in the same manner as for an original sale, and the same delay must elapse. At the second offering, the property shall be sold for cash for whatever it will bring ....' (Emphasis added.)
*378 "The Deficiency Judgment Act, R.S. 14:4106, does not prohibit the sale of seized property at less than two-thirds of its appraised value. It provides:
`If the mortgagee or other creditor takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency......' (Emphasis added.)
"R.S. 13:4106 does not change the provisions of the Code of Civil Procedure for appraisement and judicial sale. LNB did not take advantage of the waiver of appraisement. It specifically had the property sold with appraisement. Thereby, the right to a deficiency judgment was preserved. * * * *
"As here, when seized property has been duly appraised, offered for sale at two-thirds of the appraisement and no bids are received, logic does not permit the reappraisement and reoffering at two-thirds, ad infinitum. Such a requirement would eventually exhaust any equity in the property by the expense of advertising and court costs. It would not tend to make available more competitive bidders. If no one would offer two-thirds in the first place, it is highly unlikely that such an offer would be made upon the second, third or fourth try. Nor is it likely that the appraised value of the property would change appreciably between sales thereby making the offerings more attractive. LNB strictly complied with the law, bought the property in at competitive bidding after appraisement, and at all times made certain that the defendants herein had actual knowledge of what was going on thereby affording them the opportunity to protect themselves. * * * *" (Written Reasons for Judgment, Record, pp. 269-271)
The second paragraph of the Louisiana Code of Civil Procedure Article 2724[1] is express on the point and clearly indicates that the provisions of Louisiana Code of Civil Procedure Article 2336,[2] which deal with the sale of property pursuant to a writ of fieri facias at a second or subsequent offering, likewise apply to a sale of property under a writ of seizure and sale pursuant to an executory proceeding, unless appraisement has been waived, as provided in Louisiana Code of Civil Procedure Article 2723.[3] It is clear from these *379 provisions of the Code of Civil Procedure that the Legislature did not see fit to require that property seized pursuant to a writ of seizure and sale in an executory proceeding not be sold at less than two-thirds of the appraised value at a second or subsequent offering where the seizing creditor has not waived appraisement, in order to enable the seizing creditor to seek a deficiency judgment against the obligor or obligors, in accordance with Louisiana Code of Civil Procedure Article 2771.[4] The question of whether an obligor should be guaranteed a credit of at least two-thirds of the appraised value before being subjected to a deficiency judgment properly addresses itself to the Legislature. Nor does this record support the contention urged by defendants that LNB violated the letter or spirit of the law and improperly manipulated the sale of the mortgaged property pursuant to the writ of seizure and sale so as to warrant a determination that LNB should be deprived of the right to a deficiency judgment.[5]
Defendant's final specification of error involves the alleged unconstitutionality per se of the Louisiana executory process statutes, or at least the unconstitutionality thereof as applied herein. In view of the recent Louisiana Supreme Court decision of Buckner v. Carmack, La., 272 So.2d 326 (1973), this assault on executory process per se must fail. Similarly, we find no merit in the contention that such executory process law is unconstitutional as applied herein.
The judgment appealed from is affirmed, with all costs of this appeal assessed to defendants.
Affirmed.
NOTES
[1] The pertinent portion of Louisiana Code of Civil Procedure Article 2724 reads as follows:

"The provisions of Article 2336 shall also apply to a sale of property under the writ of seizure and sale, unless appraisement has been waived, as provided in Article 2723."
[2] Louisiana Code of Civil Procedure Article 2336 reads as follows:

"The property shall not be sold if the price bid by the highest bidder is less than two-thirds of the appraised value. In that event, the sheriff shall re-advertise the sale of the property in the same manner as for an original sale, and the same delay must elapse. At the second offering, the property shall be sold for cash for whatever it will bring, except as provided in Article 2337."
[3] Louisiana Code of Civil Procedure Article 2723 reads as follows:

"Prior to the sale, the property seized must be appraised in accordance with law, unless appraisal has been waived in the act evidencing the mortgage or privilege and plaintiff has prayed that the property be sold without appraisal, and the order directing the issuance of the writ of seizure and sale has directed that the property be sold as prayed for."
[4] Louisiana Code of Civil Procedure Article 2771 reads as follows:

"The creditor may obtain a judgment against the debtor for any deficiency due on the debt after the distribution of the proceeds of the judicial sale only if the property has been sold under the executory proceeding after appraisal in accordance with the provisions of Article 2723."
[5] See, e. g., Bickham Motors, Inc. v. Crain, 135 So.2d 649 (La.App. 1st Cir. 1961).