PAUL A. BONIN, Judge.
|TThe St. Henry Condominium is a three-unit condominium project on St. Charles Avenue near Audubon Park in Uptown New Orleans. Its governing declaration confers a so-called right of redemption to the condo unit owners whenever one condo unit owner sells his unit without first offering the remaining condo unit owners the right of first refusal on the purchase. Learning that the record owner of Unit B had executed a counter letter in favor of her son with respect to a 48.2% interest in her unit as well as an act of donation of the unit to her daughter-in-law, the record owners of Units A and C instituted these proceedings.
Ruling on competing motions for summary judgment, the District Court determined that the record owners of Units A and C were entitled to exercise the right of redemption by paying $500,000 for the 48.2% interest on account of the counter letter, and that the donation was valid and effectively transferred the remaining 51.8% ownership interest in Unit B to the daughter-in-law. The District 12Court further reserved unto the parties the right to partition Unit B at a later time, and deferred ruling on the claims set out in the defendants’ reconventional demand.
Upon our de novo review of the rulings on the motions for summary judgment, each of which was granted in part and denied in part, and upon our de novo examination of the Condominium Declaration and the Counter Letter, we find as a matter of law that the Counter Letter between the record owner of Unit B and her son is not a sale, and that the record owners of Units A and C are not entitled to exercise the so-called right of redemption provided for in the Condominium Declaration. Accordingly, we reverse the partial summary judgment which determined otherwise.
We note at this point that the owners of Units A and B did not appeal the District Court’s factual finding that the donation to the daughter-in-law was valid, or its consequent legal conclusion that the Act of Donation did not entitle the other condo unit owners to exercise the declaration’s right *96 of redemption. We, accordingly, decline to review these portions of the District Court’s judgment.
Consequently, as a result of our reversal of that portion of the judgment which was favorable to the owners of Units A and C and of the finality of that portion of the judgment which was not appealed by them, we dismiss with prejudice their principal demand. Also, we need not remand for further proceedings on the reconventional demand because the parties at oral argument agreed that a dismissal with prejudice of the principal demand would moot the reconventional demand.
|3We explain our decision in greater detail in the following parts.
I
Here we set forth the identities of the parties, the underlying facts, and this case’s procedural history.
A
The plaintiffs in the principal demand are 6126, L.L.C., and James Farwell and G.F. LeBreton, who were respectively the record-owners of Unit A and Unit C at the time the lawsuit was filed. None of them, however, were record-owners of either unit at the time Unit B was acquired from Thomas Black by Jon Besthoff Strauss, one of the defendants. Jon is the mother of Jeffry Strauss, who is married to Susan Carman Strauss; Jeffry and Susan are the remaining defendants in the principal demand.[1]
B
The St. Henry Condominium was established on May 16, 1978, by a document entitled Condominium Declaration Creating and Establishing Condominium Property Regime. The Condominium Declaration creates a condominium association, describes the three individual units, the common areas, and the land on which the condominium sits. The Condominium Declaration also sets out the method of the condominium association’s governance, and provides the rules regulating the condominium’s maintenance and administration.
|4The Condominium Declaration also particularly provides that with “the exception of transfers of ownership of any Unit by one spouse to another, should the owner of any Unit be desirous of leasing or selling such Unit, each other Unit Owner is hereby given and granted the right of first refusal to lease or purchase such Unit, as the case may be, on the terms and conditions herein stated, and no owner of a Unit shall lease or sell the same to any party without first giving the [Condominium] Association notice in writing of such lease or sale as herein provided, thereby giving each of the individual Unit Owner[s] the opportunity to determine whether any of them will exercise their right of first refusal.”
The notice required by the Condominium Declaration’s right of first refusal obligates a Unit Owner seeking to sell or lease his unit to provide to the Association not only “an executed copy of the bona fide offer” to lease or purchase, but also “the name, address, business, occupation or employment, if any, of the offeror.” The bona fide offer to purchase given by Jon to Mr. Black is not contained in the record, but the parties agree that only Jon’s name, and not Jeffry’s, appears.
The Condominium Declaration further provides that in the event that a Unit *97 Owner sells or leases their unit without first giving notice to the Association, and thus negating the other owners’ right of first refusal, then any of the other Unit Owners “shall have the right to redeem said Unit from such lease or sale transaction by reimbursing the lessee for the amount of any rent paid in advance ... or by refunding unto the purchaser of such Unit the purchase price paid therefore, | sin which latter event, the purchaser of such Unit shall convey the title to such unit to the electing Unit Owner.” In other words, the Condominium Declaration provides that the right of redemption cannot be exercised absent a breach of the right of first refusal.
On October 31, 2002, Jon signed the Act of Cash Sale whereby she purported to purchase an undivided one-hundred percent interest in Unit B from Mr. Black, the unit’s prior owner. The Act of Cash Sale declares and acknowledges that it is made subject to the Condominium Declaration. Attached to the Act of Cash Sale from Mr. Black to Jon are the written waivers of the right of first refusal and option to purchase Unit B signed by the then-owners of Units A and C, which written waivers noted that the purchase price to be paid was $1,087,500. That Jon paid Mr. Black that amount is undisputed.
Prior to executing the Act of Cash Sale, however, Jon borrowed from Jeffry $1,000,000, one half of which was repaid in December of 2002.[2] On the same day as the Act of Cash Sale, Jon executed the Counter Letter in favor of Jeffry before a notary and two witnesses. Jeffry, a Colorado resident, signed the Counter Letter before a Colorado notary on November 20, 2002.[3] The Counter Letter describes the parties to the document, provides a legal description of Unit B and the land on which the St. Henry Condominium sits, notes that Jon acquired an undivided one-lhundredfi percent interest to Unit B by Act of Cash Sale on October 31, 2002, and states:
That although said Act recites JON BESTHOFF STRAUSS paid a cash consideration of ONE MILLION THIRTY-SEVEN THOUSAND FIVE HUNDRED AND NO/100 ($1,037,500.00) DOLLARS, in truth and in fact, her son, JEFFRY B. STRAUSS paid part of that consideration with his separate funds, under his separate administration and control.
Appearer, JON BESTHOFF STRAUSS declares that the separate estate of JEFFRY B. STRAUSS has an undivided 48.2 percent ownership in said property and the recordation by any party of this Counter Letter shall act as a transfer and conveyance of that 48.2 percent interest to the separate estate of JEFFRY B. STRAUSS without the need to execute any further documents. Appearer, JON BESTHOFF STRAUSS, further declares that the separate estate [of] JEFFRY B. STRAUSS is granted an option to buy her 51.8 percent interest in said proper *98 ty at her death, for its fair market value. The rights granted in this Counter Letter are subject to approval of the owners of the other two units in St. Henry Condominium, and their waiver of their rights of first refusal after a determination of fair market value is made.
Both appearers declared that the above and foregoing is true and correct and that they have executed this Counter Letter as their free act and deed.
Appearer, JEFFRY B. STRAUSS, further acknowledged the transaction recited hereinabove and declared that he accepts the option to buy for his separate estate, his heirs, successors and assigns.
Additionally, Susan signed the Counter Letter before the Colorado notary on the same day as her husband and acknowledged the paraphernality of the funds used by Jeffry to purchase his interest in Unit B, and recognized that Jeffry’s interest in Unit B is his separate property under his own administration. The Counter Letter, we note, has yet to be recorded in the Conveyance Records for Orleans Parish.
|7Jon then took up residence in Unit B. That she was the sole, full-time occupant of the Unit, or that she paid all condominium dues, fees, regular assessments, and special assessments is undisputed. That Jon paid all taxes, insurance fees, maintenance and repair costs associated with Unit B is, also, not disputed.
In October of 2011 Jon suffered an illness that left her partially incapacitated. Later, in January of 2012, she decided to move to Lambeth House, a retirement community in Uptown New Orleans. On April 11, 2012, Jon wrote letters to the owners of Units A and C which stated: “I hope you are well. As you know, I have moved to Lambeth House. I would like to dispose of my interest in 6126 St. Charles Avenue, Unit B. This interest will be transferred to my children. If you do not object, please sign the enclosed Waiver so that I may transfer my interest to them. Please leave the signed Waiver on the table by the mail boxes.” The proposed waiver provided accordingly: “I have been informed of your proposed sale of Unit B of the St. Henry Condominium Association, Inc. to your son Jeffry B. Strauss, and I hereby waive my right of first refusal and option to purchase Unit B.” Instead of signing the waivers, the owners of Units A and C sought more details about the specifics of Jon’s proposed sale.
At first the plaintiffs attempted to secure this information informally, through conversations with, and letters addressed to Jon. Through conversations with Jon and Jeffry, the plaintiffs discovered that Jeffry might already have an ownership interest in Unit B. The plaintiffs, nevertheless, were unsuccessful in ^discovering the nature or terms of Jon’s proposed sale to Jeffry. Accordingly, the plaintiffs’ retained an attorney who wrote to Jon on April 30, 2012, demanding that she provide all documents reflecting Jeffry’s current ownership interest in Unit B, and any offer or purchase agreements for the sale of her current interest in Unit B.
Before her attorney responded to the April 30, 2012 letter, Jon executed an Act of Donation in authentic form on May 7, 2012, wherein she donated to Susan all of her “right, title and interest in and to” Unit B. Susan also appeared in the Act and accepted the donation as her separate and paraphernal property. The Act of Donation was recorded in Orleans Parish on May 7, 2012. On the same day as the Act of Donation, Jeffry, via letter addressed to Jon, wrote: “In view of your generous gift to Susan of your interest in the condo, my option to buy your interest at your death for fair market value as contained in our Counter Letter dated Oc *99 tober 31, 2002 and November 20, 2002, is no longer in effect.” On May 9, 2012, the Strausses’ attorney replied to the plaintiffs’ April 30, 2012, request via letter and provided plaintiffs with a copy of the Counter Letter, but not the Act of Donation.
C
The plaintiffs filed suit for declaratory judgment, specific performance, breach of contract, and/or partition against the Strausses on May 14, 2012. Specifically, the plaintiffs asked the District Court to: 1) declare that they are entitled to redeem from Jeffry his 48.2% interest in Unit B; 2) declare that plaintiffs are entitled to redeem from Jeffry “full ownership of the Option granted | flto him by Jon to purchase her 51.8% interest in Unit B”; 3) declare that the May 7, 2012, Act of Donation is null and void because Jon had no legal right under the Condominium Declaration to transfer her interest in Unit B; 4) declare that the May 7, 2012, Act of Donation is a disguised sale, thus entitling plaintiffs to redeem Susan’s interest in Unit B; 5) rule that defendants be held liable for conspiring to conceal the transfers of interest in Unit B; and 6) grant a partition of Unit B by licitation in the event it concludes that plaintiffs are entitled to redeem less than one hundred percent of Unit B from the defendants.
The Strausses filed an answer and re-conventional demand on June 29, 2012, wherein they asserted as affirmative defenses, among other things, that the Counter Letter and donations do not constitute sales or leases of Unit B, and they, therefore, do not trigger the Condominium Declaration’s rights of first refusal and redemption. The Strausses’ reconventional demand asks the District Court for a judgment declaring that: 1) at the time Jon acquired Unit B the rights of first refusal in favor of the owners of Units A and C had been waived; 2) the Condominium Declaration’s right of first refusal applies only to sales and leases; 3) the Counter Letter and Act of Donation were neither sales nor leases; 4) the rights of first refusal in favor of the owners of Units A and C were not triggered by the Counter Letter and the Act of Donation; 5) no transfer of interest between Jon to Jeffry occurred because the Counter Letter was never recorded in the Orleans Parish conveyance records; 6) the Act of Donation is valid and binding; 7) Jeffry | inrevoked the option to purchase contained in the Counter Letter; and 8) Susan is currently sole owner of Unit B.[4]
The Strausses filed a motion for summary judgment on October 15, 2012, wherein they argued that the District Court should dismiss the plaintiffs’ claims for redemption because neither the Counter Letter nor the Act of Donation were sales or leases that would trigger the Condominium Declaration’s rights of first refusal and redemption. The plaintiffs filed a cross-motion for summary judgment on December 20, 2012, wherein they argued that the Counter Letter and the Act of *100 Donation violated the Condominium Declaration’s right of first refusal provision, thus entitling them to a judgment which provides for the transfer of full ownership of Unit B to them upon the payment of the redemption price in accordance with the terms of the Condominium Declaration.
The parties argued the merits of their respective motions before the District Court on January 18, 2018. The District Court granted in part and denied in part both motions and signed a written judgment on April 4, 2013. The transcript of the oral argument reveals that the District Court concluded that Jeffry is the owner of an undivided 48.2% interest in Unit B. It further held that Jon’s grant to Jeffry of an option to purchase her 51.8% interest in Unit B after her death transformed the InCounter Letter into an act of sale, thus implicating the Condominium Declaration’s right of first refusal. Accordingly, the District Court’s written judgment held that the owners of Units A and C are entitled to exercise their rights of redemption with respect to Jeffry’s 48.2% undivided interest in Unit B. The District Court also concluded that the May 7, 2012, Act of Donation from Jon to Susan is valid, effective, and not violative of the Condominium Declaration’s right of first refusal. The District Court, therefore, concluded that the plaintiffs have no right to purchase Susan’s 51.8% undivided interest in Unit B. The District Court, additionally, certified its judgment as final and appealable, but reserved to the parties the right to seek a partition of the property should the plaintiffs exercise their rights of redemption with respect to Jeffry’s 48.2% interest in the property. Lastly, the District Court ruled that the April 4, 2018 judgment was neither a final judgment, nor an interlocutory ruling, with respect to those claims brought by the Strausses in their recon-ventional demand. The Strausses timely filed a petition for suspensive appeal from the April 4, 2013 judgment. The plaintiffs, on the other hand, failed to file a petition for appeal or answer the Strausses’ petition for appeal pursuant to La. C.C.P. art. 2133.
II
A
Before turning to the Condominium Declaration and the Counter Letter, we set forth the standard by which we review any summary judgment. We review the granting of a summary judgment under the de novo standard, which means that 113“we look at the facts and evidence in the record before us, inspecting it without regard or deference to the judgment of the trial court or its reasons for judgment.” Cusimano v. Port Esplanade Condominium Assn., Inc., 10-0477, p. 4 (La.App. 4 Cir. 1/12/11), 55 So.3d 931, 934. The trial judge’s reasoning may well be informative, but it is not determinative of the legal issues to be resolved by us. Cusimano, 10-0477, pp. 4-5, 55 So.3d at 934.
B
With respect to the Condominium Declaration and the Counter Letter at issue here, they are contracts and the rules of contract interpretation apply to them. See Cusimano, p. 8, 55 So.3d at 936 (“rules of contract interpretation apply to interpretation of a condominium declaration”); Dawsey v. Gruber, 94-1466, p. 3 (La.App. 4 Cir. 7/1/94), 647 So.2d 1084, 1086 (La.1994) (a counter letter is an agreement, a contract, between a record owner and non-record owner whereby the record owner recognizes the true ownership interest of the non-record owner).
Contracts have the effect of law between the parties, and the courts are bound to interpret them according to the *101 common intent of the parties. See La. Civil Code Arts.1983 and 2045; see also La. R.S. 9:1124.115 A (“The condominium declaration and bylaws shall have the force of law between the individual unit owners.”) If the words of a contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the true intent of the parties. See La. Civil Code Art. 2046. Each provision in a contract must be interpreted in light of the other provisions so 113that each is given the meaning suggested by the contract as a whole. See La. Civil Code Art. 2050. “When a contract is not ambiguous or does not lead to absurd consequences, it will be enforced as written and its interpretation is a question of law for a court to decide.” Lalla v. Calamar, N.V., 08-0952, p. 8 (La.App. 4 Cir. 2/11/09), 5 So.3d 927, 932, quoting American Deposit Ins. Co. v. Myles, 00-2457, p. 5 (La.4/25/01), 783 So.2d 1282, 1286. Meaning and intent of parties to a written instrument is ordinarily determined from the instrument’s four corners and extrinsic evidence is inadmissible either to explain or to contradict the instrument’s terms. Lalla, 08-0952, p. 8, 5 So.3d at 932. Notably, the interpretation of a contract’s provisions is typically a matter of law that is especially and properly decided by summary judgment. See Hall v. Malone, 12-0264, pp. 4-5 (La.App. 4 Cir. 11/7/12), 104 So.3d 593, 596. And so the interpretation of unambiguous provisions in contracts (such as condo declarations or counter letters) is a matter of law, which we review under the de novo standard.
C
With particular attention to counter letters, recent jurisprudence indicates that they are acknowledgments of true ownership and indicate that one or more of the record owners hold title to the property as agent for the person, or persons, named in the counter letter. See Roy v. Robco, Inc., 98-214, p. 4 (La.App. 5 Cir. 10/14/98), 721 So.2d 45, 46 (“A counter-letter is a binding agreement between record owners and non record owners whereby the record owner recognizes the true ownership interests of the non record owner.”) More precisely, a “counter 114letter does not secretly convey property from the record owner to the non-record owner; rather, it is an expression of the true intent of the parties at the time the act of public record was executed.” Whittington v. Bienvenu, 539 So.2d 832, 836 (La.App. 3 Cir.1989). Counter letters, therefore, reflect an ownership interest in the underlying property and indicate that the record owner holds title to the property as agent for the person named in the counter letter. See Peterson v. Moresi, 191 La. 932, 940, 186 So. 737, 739 (La.1939); and Roy, 98-214, p. 6, 721 So.2d at 47.
Ill
We now look to the plain language of the Condominium Declaration’s provisions at issue and then look to the Counter Letter at issue in order to determine whether the existence of the Counter Letter allows the now-owners of Units A and C to demand a right of redemption of Unit B from the defendants.
A
A right of first refusal is an agreement by one party that he will not sell a certain thing without first offering it to a certain person. See La. Civil Code Art. 2625. Under the legal regime, the right may be enforced by specific performance. Id. The right of first refusal is a unilateral obligation; the grantor alone is obligated to act and the person holding the right of first refusal is not required to *102 accept the offer, though failure to accept the offer permits the grantor to then sell the thing to a third party. See Alain Levasseur & David Gruning, Louisiana Law of Sale and Lease: A Précis § 1.1.4 (Alain Levasseur, John Trahan, Andrea Carroll & Ronald 11sScaIise, eds., Matthew Bender & Company,' Inc., a member of the LexisNexis Group 2007).
“[T]he right of first refusal [imposes] on the grantor an obligation not to do ie. not to sell to another before offering to sell to the grantee, rather than an obligation to do ie. sell to the grantee first” and “is subject to two suspensive conditions”: a) the grantor’s intent to sell and b) the grantee’s agreement to purchase “on the same terms, or on those specified when the right was granted if the parties have so agreed.” La. Law of Sale & Lease, supra, at 15; see also La. Civil Code Art. 2625. The same terms of the offer made to another person (price, modalities of payment, etc.) must be made to the holder of the right of first refusal. See La. Law of Sale and Lease, supra.
Similarly, the plain language of the conventional Condominium Declaration indicates that right of first refusal is triggered by an offer to purchase or sell a condo unit. As we observed in Part I-B, ante, Mr. Black undoubtedly presented Jon’s bona fide offer to purchase to the other condo Unit Owners and they executed written waivers by which they declined to exercise their right of first refusal and thereby acquire Unit B for $1,037,500.00.
The plaintiffs, however, stake their claim to Unit B on Jon’s supposed violation of the right of first refusal’s notice provision, which obligates a Unit Owner to provide to the Association not only “an executed copy of the bona fide offer” to purchase, but also “the name, address, business, occupation or employment, if any, of the offeror.” The Counter Letter is, the plaintiffs contend,_J_^the proof that the Declaration’s provision was breached because Jeffry’s identity as an “offeror” was not disclosed by Jon to their predecessors-in-title. The plaintiffs conclude that they are thus entitled to redeem Unit B, or a portion of it, by paying to Jon (or Jeffry or Susan) the amount paid for the unit by Jon in 2002.
The plain language of the Condominium Declaration, however, does not support this assertion. Simply stated, the Condominium Declaration’s right of first refusal obligates only a Unit Owner — in this case Mr. Black, Jon’s predecessor in title — to disclose the terms of the offer to purchase, as well as the name, occupation, etc., of the proposed purchaser to the Condominium Association as a condition precedent to a sale or purchase. The Condominium Declaration’s clear dictates did not obligate Jon, who was at that time no more than a proposed purchaser, to disclose anything in 2002 to the then record owners of Units A and C. Because, moreover, the Counter Letter, as we discuss in Part III— C post, was neither a sale nor a lease of Unit B, its execution did not obligate Jon to disclose its provisions to the owners of Units A & C.
Our review of the Condominium Declaration indicates that the right of redemption is only activated by the discovery that a Unit Owner sold his unit without first properly notifying the other Unit Owners of the opportunity to exercise their rights of first refusal. In other words, a Unit Owner cannot exercise his right of redemption absent a preceding breach of the right of first refusal. The exercise, moreover, of both rights is contingent upon either the proposed or actual |17sale of a unit, as opposed to all manner of otherwise legal attempts to transfer an interest in *103 the unit.[5]
B
A sale is “a contract whereby a person transfers ownership of a thing to another for a price in money.” La. Civil Code Art. 2439. Accordingly, “[t]he thing, the price, and the consent of the parties are requirements for the perfection of a sale.” Id. By its very terms the Counter Letter is not a sale.
A plain reading of the Counter Letter (see Part I-B, ante) reveals that Jon is not transferring any ownership interest in Unit B to Jeffry in exchange for a price. Likewise, the Counter Letter betrays no intent by Jeffry to pay a sum of money to his mother as consideration for a transfer of an interest in Unit B. The option to purchase contained in the Counter Letter, likewise, does not reflect a sale. The clear language of the Counter Letter indicates that Jon’s granting of the option was not contingent upon Jeffry’s payment of any price.
Instead, the Counter Letter at issue is remarkably similar to the Counter Letter analyzed by the Supreme Court in Peterson v. Moresi, supra. The language is so similar that we are of the opinion that Peterson fully resolves the outcome of this controversy.
In Peterson, the plaintiffs sued the wife and daughter of a deceased property owner to be declared owners of various undivided interests in the immovable |! «property at suit and for an accounting. The effect of a counter letter was at issue. The counter letter was signed by the deceased record owner of the immovable property and stated that the plaintiffs and their heirs owned certain undivided interest in immovable property. The Peterson counter letter provided in pertinent part:
I, A.P. Moresi, a resident of the Parish of Iberia, State of Louisiana, do hereby state that I have this day purchased from William Lee McFarlain, of the Parish of Acadia, State of Louisiana, Seven (7) acres of land, being a part of Lot numbered Three (3) in Section Forty-one (41) in Township Nine (9) South, Range Two (2) West, of the Louisiana Meridian, situated in the Parish of Acadia, in said State, and fully described in the warranty deed filed for record on this day, and that I have leased this day from the said William L. McFarlain Lots numbered Four (4) and Five (5), except the earthen tanks and buildings thereon, and being a part of said Section Forty-one (41), and also Twenty (20) acres in the Northeast corner of Lot Four (4) of Section Thirty-eight (38) in said township and range, and that the following named persons have the following interest in said property:
A.P. Moresi an undivided 4/21 interest therein;
S.A. Moresi an undivided 4/21 interest therein;
A.D. Moresi an undivided 4/21 interest therein;
Arthur Schexnayder an undivided 1/21 interest therein;
Jules Maritzky an undivided 5/21 interest therein;
Ike Maritzky an undivided 3/21 interest therein; and that said named persons have paid their pro rata share and portion of said purchase price, and when so requested I will execute an act of transfer conveying to them or their as *104 signs their respective interest in said premises.
Peterson, 191 La. at 935-936, 186 So. at 737-738.
In language no less applicable to the dispute before us today, the Supreme Court observed with respect to the Peterson counter letter:
119The instrument on which this suit is founded is neither a sale nor an offer to sell; it does not purport to be a transfer of title, or a promise on the part of A.P. Moresi to transfer title from him to the other persons named in the instrument. The instrument is merely an acknowledgment by A.P. Moresi that he bought the land for himself and as the agent for the other persons named in the instrument, and that they paid the price in proportion to the interests which they acquired, and hence that they all owned the property jointly and in the proportions stated in the instrument. A.P. Moresi’s expression of willingness to execute an act of transfer if or when requested so to do was deemed proper because the title apparently stood in his name; but this expression of willingness to execute an act of transfer was not hampered with any condition, or coupled with any obligation to be performed by any one who might request an act of transfer. The instrument is more of the character of a counter letter than of any other instrument that has been suggested. It is pointed out in the brief for the appellees that the agency of A.P. More-si, which was not disclosed in the sale made to him by McFarlain, was what the French jurists and commentators call pretenom, -meaning one who lends his name.
191 La. at 940, 186 So. at 739.
Like the Peterson counter letter, the one executed by the Strausses’ recognizes current ownership interests. The Counter Letter here does not secretly convey a property interest or evince a promise to convey, in exchange for consideration, a property interest at some future time, but instead acknowledges a state of affairs already established between the signatories. Thus, the Counter Letter here is not a sale but an expression of the true intent of the parties to the Counter Letter at the time the Act of Cash Sale was executed. See Whittington, 539 So.2d at 836.
Because the Counter Letter was not a sale, it did not constitute a breach of the Condominium Declaration’s right of first refusal. The Counter Letter did not constitute a bona fide offer to purchase Unit B, and Jon’s acknowledgment of 1 gnJeffry’s role in her purchase of Unit B did not transform Jeffry into an offeror under the terms of the Condominium Declaration. And thus Mr. Black’s failure to disclose the identity of Jeffry could not breach the Condominium Declaration’s notice provisions. Accordingly, as a matter of law, the plaintiffs cannot exercise the right of redemption because the obligation to afford the right of first refusal was not breached. See La. Civil Code art. 1767 (“If the obligation may not be enforced until the uncertain event occurs, the condition is sus-pensive.”)
IV
Before concluding our discussion, we address the consequence of the plaintiffs’ failure to appeal or answer the Strausses’ appeal. As noted, the plaintiffs ask us to overturn the District Court’s finding that the Act of Donation was valid, effective, and binding. The plaintiffs, however, failed to file a petition for appeal, or even answer the Strausses’ petition for appeal, seeking reversal of this portion of the District Court’s judgment.
*105 An appeal is necessary in order for a party to exercise its right “to have a judgment of the trial court revised, modified, set aside, or reversed by an appellate court”. La. C.C.P. art. 2082. In order for the appellate court to modify a judgment, the party asking for the modification must file either a motion for appeal or a written answer to the appeal. See Saacks v. Mohawk Carpet Corp., 03-0386, p. 25 (La.App. 4 Cir. 8/20/03), 855 So.2d 359, 375. In order to appeal, it is necessary that an order therefore be obtained within the delay allowed. La. C.C.P. art. 2121. The plaintiffs have failed to secure such an order, and the delay for taking an | ai appeal in this case has long since expired. La. C.C.P. arts. 2087 and 2123. Alternatively, appellees, such as the plaintiffs, may answer an appeal of appellants such the Strausses:
A. An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer. Additionally, however, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court. If an appellee files such an answer, all other parties to the incidental demand may file similar answers within fifteen days of the appel-lee’s action.
B. A party who does not seek modification, revision, or reversal of a judgment in an appellate court, including the supreme court, may assert, in support of the judgment, any argument supported by the record, although he has not appealed, answered the appeal, or applied for supervisory writs.
La. C.C.P. art. 2133 (emphasis added). The plaintiffs, however, failed to file an answer to the Strausses’ appeal and the delay to do so has long since expired. The plaintiffs, nevertheless, argue that we are empowered to reverse the District Court’s rulings with respect to the Act of Donation by virtue of La. C.C.P. art. 2164, which provides in pertinent part that an “appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.” We note, however, that a party’s failure to timely seek the modification or reversal of an underlying judgment is a “jurisdictional defect, in that neither the court of appeal nor any other court has the jurisdictional power and authority to reverse, revise or | ^modify a final judgment after the time” for seeking such modification or reversal has elapsed. Baton Rouge Bank & Trust Co. v. Coleman, 582 So.2d 191, 192 (La.1991). Accordingly, when a party fails to seek timely modification or reversal of an underlying judgment, “the judgment acquires the authority of the thing adjudged, and the court of appeal has no jurisdiction to alter that judgment.” Id.
Under these circumstances, with neither an appeal nor an answer to appeal by the plaintiffs, we cannot consider their argument that the District Court erred when it concluded that the Act of Donation from Jon to Susan was valid and should be reversed. We, accordingly, cannot reverse the District Court’s April 4, 2013 judgment regarding the Act of Donation.
*106 CONCLUSION
The District Court erred when it granted in part the plaintiffs’ motion for summary judgment which held that the Counter Letter violated the Condominium Declaration’s right of first refusal, thus allowing the plaintiffs to exercise their right of redemption with respect to any interest that Jeffry B. Strauss may have in Unit B.
We, therefore, reverse that portion of the District Court’s April 4, 2013 judgment which holds that the owners of Units A and C, plaintiffs/appellees herein, “have the right of redemption with respect to a 48.2% undivided interest, referred to in a Counter Letter, dated October 31, 2002 and November 20, 2002, between Jon Bes-thoff Strauss and Jeffry B. Strauss.” Likewise, we reverse that portion of the District Court’s April 4, 2013 judgment which provides that the | ¡¡¡¡owners of Units A and C, plaintiffs/appellees herein, are entitled to exercise the aforementioned right of redemption by payment of $500,000.00 to Jeffry B. Strauss pursuant to the Condominium Declaration.
Consequently, as a result of our reversal of that portion of the judgment which was favorable to the owners of Units A and C and of the finality of that portion of the judgment which was not appealed by them, we dismiss with prejudice their principal demand. Also, we need not remand for further proceedings on the Strausses’ re-conventional demand because the parties at oral argument agreed that a dismissal with prejudice of the principal demand would moot the reconventional demand.
DECREE
There is judgment herein reversing the lower court judgment of April 4, 2013, and decreeing judgment in favor of Jon Bes-thoff Strauss, Jeffry B. Strauss, and Susan Marie Carman Strauss, and against 6126, L.L.C., James Farwell, and G.F. LeBre-ton, dismissing with prejudice their principal demand. The reconventional demand is dismissed as moot by agreement of the parties. All costs are taxed to the appel-lees. See La. C.C.P. art. 2164.

REVERSED AND RENDERED.

. For simplification of reference, we will often refer to these named defendants by their first names.

. The record before us contains no loan documentation. All parties’ statements of undisputed fact, filed along with their competing motions for summary judgment, indicate, however, that Jeffry loaned Jon the funds prior to the October 31, 2002, Act of Cash Sale.

. Jeffry did not, however, sign the Counter Letter before two witnesses. The Counter Letter, therefore, is not an authentic act. See La. Civil Code Art. 1833 B. The Counter Letter, nevertheless, is a valid act under private signature. See La. Civil Code Art. 1834. Although counter letters need not be in any specific form, they must nevertheless be in writing. Roy v. Robco, 98-214, p. 4 (La.App. 5 Cir. 10/14/98), 721 So.2d 45, 46.

. The Strausses, additionally, requested a judgment: 1) declaring that either Susan individually, Jon individually, and/or Jon and Jeffry are entitled to redeem Units C from its current owners; 2) transferring the ownership of Unit A from 6126, L.L.C. to Charles Goodyear, the husband of 6126, L.L.C.’s registered manager; 3) for damages against plaintiffs as a result of the alleged improper filing of a Notice of Lis Pendens against Unit B; 4) an order instructing the Clerk of Court for Orleans Parish to cancel and erase the Notice of Lis Pendens from mortgage records; and 5) for damages against plaintiffs as a result of the alleged conspiracy to attempt to wrongfully divest the Strausses of their rights to Unit B. These matters, however, were not addressed by either of the two summary judgments ruled upon by the District Court, and they are not before us on this appeal.

. As we have indicated, the Condominium Declaration also provides a right of first refusal and a right of redemption with respect to leases. But there is no contention that a lease is at issue in this case.