MOORE, J.'
hMohamed “Jack” Saheid appeals a judgment that recognized Roy Gish as the owner of a 12 ⅜% mineral interest in a 1,096-acre tract of land in north Caddo Parish that Saheid purchased from Gish by three transactions in 2004 and 2008. For the reasons expressed, we affirm.

Factual Background

Saheid, an investor then living in Worth-ing, England, testified that in 2004 he was trying to buy a hotel in New Orleans. When that deal fell through, a real estate agent suggested buying an oil and gas field in north Louisiana.- A broker named Carl David got in touch with Gish, who was *988 then living in Belcher and was interested in selling his 1,096-acre tract of land complete with about 600 oil and gas wells. After several phone conferences, Saheid faxed to David an undated offer (“the Offer”) to buy the property for $4 million “for 100% ownership,” with $200,000 down and the remainder to be owner-financed over five years.
On October 9, 2004, Saheid and Gish signed a one-page, unnotarized agreement (“the Agreement”) with respect to “Real Estate transaction involving 1,096 acres, including all oil and gas leases, rent houses, all structures and other equipment as stated in previous documents, located at 9886 N Hwy 169, Belcher, Louisiana.” The Agreement included this final provision:
Other: SELLER to give a best effort to deliver to BUYER the remaining 12 ⅜% GISH family oil and gas lease holding.
On November 2, 2004, the parties met at First Title Corporation in Metairie, Louisiana, and executed an authentic act entitled Act of Credit Sale and Assignment of Oil, Gas and Mineral Leases, Rights to Pipelines and LWells and Gathering Systems, and Equipment Leases (“the Act of Credit Sale”). The Act of Credit Sale recited that Gish and “The Roy D. Gish and Norma L. Gish Charitable Remainder Unitrust” conveyed “ALL THAT CERTAIN LOT OR PARCEL OF GROUND,” with all rights, ways, servitudes and component parts, to Saheid. The Act of Credit Sale included a special provision (“Paragraph K”) that stated:
K. The Trust and Purchaser acknowledge and agree that the Trust has represented to the Purchaser that the Trust is the sole and only owner of an undivided 87.5% interest in and to the leases assigned herein. Should that representation be incorrect, and should any claim be successfully asserted against the interest conveyed by the Trust to the Purchaser, then, and in that event, the purchase price attributable to said leases shall be reduced by the sum of [$400,-000], without the necessity of the modification of this agreement and/or the execution of any other documents, provided, however, that any such claim be asserted on or before November 80, 2009.
Gish testified that he received, and Sa-heid confirmed that he paid, the 12 ⅜% mineral royalty for almost four years, until early 2008. To resolve this and other points of dispute, the parties executed an authentic act labeled “Contract,” on April 24, 2008. Gish agreed to reduce Saheid’s monthly payment, to suspend payments for three months, and to allow Saheid to enter mineral leases without Gish’s consent. Saheid agreed to dismiss a federal suit against Gish and his family trust, and to delete Paragraph K in its entirety from the Act of Credit Sale. The Contract included this additional provision (“Paragraph 2(d)”):
2. Buyer shall: * * *
d) Waive and relinquish all rights to reduce the purchase price based on any claim that the percentage interest in any land ownersf] royalty interest or leases assigned to buyer were less than what has been represented by seller * * *. Buyer consents to and acknowledges that seller has and shall continue to withhold a 6.25% royalty for the Kennedy family and a 6.25% royalty to Ruth Sheppard et al, on the 1,096 acres.
IsGish testified that the final payment he received was for May 2008 royalties; Department of Conservation records showed that Saheid shut in the wells for four months, and then signed a paid-up mineral lease wherein the lessee paid all royalties to Saheid, and none to Gish, his family members or the trust. Gish and his family members sent demand letters in January *989 and October 1009, but Saheid never paid them their claimed 12 ½%.
Gish, joined by his mother, Charlotte, his sister, Ruth (and her husband), and his own wife, Rena, filed this suit against Sa-heid in March 2010. He sought recognition of the plaintiffs’ respective 6 ¾% (total 12 ½%) royalty interests, an accounting, sequestration of all proceeds, and double damages under La. R.S. 31:212.21.

Evidence at Trial

After extensive discovery and cross-motions for summary judgment, the case came to trial in August 2015. Observing that Gish was the only plaintiff to appear in court, Saheid moved for involuntary dismissal of all other plaintiffs, La. C. C. P. art. 1672 A(l). Gish agreed as to his wife, his sister and her husband, and they were dismissed without prejudice, but Gish claimed the whole 12 ½%, not just his mother’s 6 ⅛%. Saheid filed an exception of no right of action as to the sister’s 6 ⅜%; the court referred this to the merits.
Four witnesses testified. Carl David, the broker, testified that he recalled the Agreement and was present when the Act of Credit Sale was executed. The deal was that Saheid was buying 100% of the tract except for this 12 ½% mineral interest. In the Agreement, Gish was going to try to convince his mother and sister to sell their share, and in the Act of Credit Sale, they added Paragraph K because they could not get a definite title Ropinion as to ownership of the minerals, but Saheid was very unhappy about not getting all the minerals. Over time, the relationship strained, in David’s view, because Saheid thought Gish was trying to get the property back and run it dry, while Gish thought Saheid just was not paying him. They executed the Contract in a lawyer’s office, at which time David thought they had resolved all differences. However, David learned that a potential lessee had advised Saheid that the family’s 12 ½% interest was not recorded, so Saheid stopped paying. David felt that Paragraph 2(d) reiterated that, of the mineral interest, all Gish had ever sold and all Saheid had ever bought, was 87 ½%. On cross-examination, David admitted that he had done no independent research as to whether Gish’s family had a recorded 12 ½% mineral interest, and agreed that the Contract was “poorly drafted.”
Gish, who now lives in New Boston, Texas, testified that the original deal was to sell the land and minerals outright for $4 million, but Saheid could not get financing. They therefore settled on owner financing with a retention of 12 ½% mineral interest for his mother and sister, a point accurately stated (in Gish’s view) in the Agreement and in Paragraph K. Gish also testified that since he bought out his brother, he was full owner of the land, surface and minerals, and had established the trust for tax purposes, but this did not affect the 12 ⅜% retention. Gish insisted that his intent was to sell only 87 ⅜% of the minerals, as reflected in the Agreement, the Act of Credit Sale and the Contract, and confirmed by the fact that Saheid paid him 12 ½% mineral royalties for nearly four years.
On cross-examination, Gish admitted he had no written agreement to share royalties with his mother and sister, they had no contract with Saheid, and none of the documents defined “Kennedy family” or his sister “et al.” |5He also conceded that in February 2009, he and Saheid executed, under private signature, a four-page Act of Correction, which made no mention of the 12 ½% retention; however, this document merely made small adjustments to the property description and did not affect the percentage of interest conveyed. He also admitted that in November 2008, he signed, for purposes of Texas state taxes, an Affidavit of Possession swearing that he *990 sold the “entire working interest” in the Caddo Parish wells and the entire mineral estate. However, he also showed his handwritten addendum, “royalty payments of 12 ⅜% from 100% of mineral rights,” half each to his sister and mother. On redirect, he admitted he should have recorded his family’s 12 ½% interest, but felt that as record owner of 100%, he could sell any portion of it he wished.
Saheid, who now lives in Midland, Texas, testified that he had bought property before but never mineral interests. He hand-wrote the Offer and faxed it to David, expecting to buy the land and minerals outright for $4 million, and was unaware of the 12 ⅝% being “claimed by” the Gish family. He recalled Gish telling him he could not sell the 12 ⅜% because his family owned it; being unfamiliar with Louisiana law, he trusted Gish’s representation. Sa-heid never intended to give 12 ½% to the Gish family, and explained Paragraph K by saying he was “very confused quite frankly in New Orleans.” He signed it because he wanted to get $400,000 off the purchase price, and felt it was Gish’s duty to pay his mother and sister their share out of whatever he (Gish) received. Saheid confirmed that in 2008, a prospective lessee advised him the family’s royalty interest was not recorded in Caddo Parish, so he quit paying; Gish responded by “stealing” pipes and equipment from the oilfield, Saheid filed a writ of sequestration, resulting in |fia “very unfortunate affair.” Saheid also admitted signing the Contract, but his intention was not to transfer any royalty interest to Gish or to pay any royalties. He thought it significant that the Act of Correction, which they signed in February 2009, was totally silent as to the 12 ⅜%, and felt this confirmed his original intent to buy the minerals outright.
On cross-examination, Saheid admitted not hiring an attorney to run a title search before he signed the Agreement, .the Act of Credit Sale and the Contract, and agreed he should have done so. He candidly admitted, “Mr. David mentioned the fact that Mr. Gish was only selling me 87 ½%,” and moments later, referring to Paragraph 2(d), “I see nothing wrong with that. * * * It’s a fact, I mean, I agreed to it.”
William Reed Huguet, an attorney at Kean Miller LLP and a former landman, was accepted as an expert in “title opinion on mineral lease ownership” and testified on Saheid’s behalf. He had examined the public records and, as of 1995, Gish owned the tract and the minerals outright, with no trust or mineral servitudes affecting it. Huguet had searched diligently and could not find the outstanding 12 ⅜% mineral interest at issue; he therefore concluded that it did not exist. On cross-examination, he conceded his title search had not turned up the Agreement, which preceded the Act of Credit Sale. He initially said it was not relevant, but admitted that as the 100% owner, Gish could sell 87 ½% and keep the rest, if the instrument contained a specific reservation of interest.

Action of the District Court

On October 26, 2015, the court delivered oral reasons. The court cited the Agreement (which referred to a 12 ⅜% mineral interest “remaining”), the Act of Credit Sale (“an undivided 87.5% interest in and tojjthe leases assigned herein”) and the Contract (“seller has and shall continue to withhold” two 6 ⅝% shares). The court also found the parties ■ conceded the Contract was “inartfully drafted” and that the “mineral interests wei’e not reserved as they should have been.” Because of the ambiguity, the court accepted the parol evidence and the recurrent reference to “12.5 mineral interest being withheld.” The court further found that Saheid’s compliance with the 12 ⅜% retention for several years supported the intent of the parties. The *991 court therefore recognized Gish’s ownership of 12 ½% of the minerals and ordered an accounting.
The written judgment, issued in January 2016, expressed these holdings and also denied Saheid’s exception of no right of action.
Saheid has appealed, raising four assignments of error. His main thesis is that the plaintiffs did not reserve any mineral interests when they sold the property to Saheid; the transfer documents did not set forth any reservation of 12 ½% interest; and the court committed manifest error in finding ambiguity and admitting parol evidence.

Applicable Law

In the context of mineral rights, just as in other contexts, the interpretation of contracts is the determination of the common intent of the parties. La. C.C. art. 2045; Olympia Minerals LLC v. HS Resources Inc., 2013-2637 (La. 10/15/14), 171 So.3d 878; Quality Envtl. Processes v. LP Petroleum Co., 2013-1582 (La. 5/7/14), 144 So.3d 1011. Courts give the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. La. C.C. art. 2047. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. C.C. art. 2046; Mack Energy Co. v. Expert Oil & Gas LLC, 2014-1127 (La. 1/28/15), 159 So.3d 437; Clovelly Oil Co. v. Midstates Petroleum Co., 2012-2055 (La. 3/19/13), 112 So.3d 187.
Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intent of the parties is ambiguous. Campbell v. Melton, 2001-2578 (La. 5/14/02), 817 So.2d 69; BRP LLC (Delaware) v. MC La. Minerals LLC, 50,-549 (La.App. 2 Cir. 5/18/16), 196 So.3d 37. A contract is deemed ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of the contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language used. La. C.C. art. 1848; Campbell v. Melton, supra; Franklin v. Camterra Res. Partners Inc., 48,021 (La.App. 2 Cir. 5/22/13), 123 So.3d 184, 181 Oil & Gas Rep. 348.
The parol evidence rule applies to mineral rights just as it does to real estate rights. Hayes v. Muller, 245 La. 356, 158 So.2d 191 (1963); Texas Gen’l Petroleum Corp. v. Brown, 408 So.2d 288 (La. App. 2 Cir. 1981). A landowner may convey, reserve or lease his right to explore and develop his land for production of minerals and to reduce them to possession. La. R.S. 31:15; Doyal v. Pickett, 628 So.2d 184, 129 Oil & Gas Rep. 24 (La. App. 2 Cir. 1993); Hayden v. Phillips, 94-0130 (La.App. 1 Cir. 11/10/94), 646 So.2d 1014, 133 Oil & Gas Rep. 41, writ denied, 95-0244 (La. 3/24/95), 651 So.2d 291.
Credibility determinations are within the district court’s discretion and should not be disturbed on review where conflict exists in the testimony absent a determination that the district court abused its discretion. Lomont v. Bennett, 2014-2483 (La. 6/30/15), 172 So.3d 620; Stobart v. State, 617 So.2d 880 (La. 1993). Only where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it, may the court of appeal find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Lomont v. Bennett, supra; Stobart v. State, supra.
*992 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. La. C. C. P. art. 1154. If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that admission of such evidence would prejudice him in maintaining his action or defense on the merits. Id.; Brantley v. Kaler, 43,418 (La.App. 2 Cir. 6/4/08), 986 So.2d 188. A party who wishes to introduce evidence not within the issues raised by the pleadings must move to amend the pleadings before the evidence can be offered over an objection. Alaska S. Partners v. Baxley, 35,206 (La.App. 2 Cir. 10/31/01), 799 So.2d 680, and citations therein. When the pleading in question is construed in its entirety and with all other matters occurring during trial that relate to the pleading, and it is more reasonable than not to conclude that the adverse party received fair notice and was fairly informed of the pleading’s intended substantive result, the pleading will be held to be legally effective. Boudreaux v. Boudreaux, 2015-0536 (La. 10/14/15), 180 So.3d 1245; Zimmerman v. Progressive Sec. Ins. Co., 49,982 (La.App. 2 Cir. 8/12/15), 174 So.3d 1230.
Only a person having a real and actual interest to assert may bring an action. La. C. C. P. art. 681; Eagle Pipe & Supply Inc. v. Amerada Hess Corp., 2010-2267 (La. 10/25/11), 79 So.3d 246, 174 Oil & Gas Rep. 32; Wagoner v. Chevron USA Inc., 45,507 (La.App. 2 Cir. 8/18/10), 55 So.3d 12, 178 Oil & Gas Rep. 978, writ denied, 2010-2773 (La. 3/2/12), 83 So.3d 1032. The peremptory exception of no right of action is used to show that a plaintiff has no legal right or interest in enforcing the matter asserted, based on the facts and evidence submitted. La. C. C. P. art. 927. The burden of proof of establishing the exception of no right of action is on the party raising the exception. Wagoner v. Chevron USA, supra. Evidence is admissible on the trial of the exception of no right of action to “support to controvert any of the objections pleaded, when the grounds therefor do not appear from the petition.” La. C. C. P. art. 931; Industrial Cos. Inc. v. Durbin, 2002-0665 (La. 1/28/03), 837 So.2d 1207.
Discussion: Parol Evidence and the 12 ⅞% Retention
By his first assignment of error, Saheid urges the court committed legal error in finding the documents ambiguous and allowing Gish to use parol evidence. He contends the Act of Credit Sale transferred all land and rights to Saheid. He offers an exposition of the public records doctrine[1] and shows that his expert, Huguet, scoured the public records finding no evidence that the plaintiffs had any right in this property or its minerals; as a InPurchaser, Saheid was not bound by any unrecorded mineral interests. He argues that Meraux v. R.R. Barrow Inc., 219 La. 309, 52 So.2d 863 (1951) is apposite: in that case, no plaintiff ever recorded a separate royalty interest, and the court rejected the plaintiffs’ claims; the same result should obtain here. Moreover, both the Act *993 of Credit Sale and the Contract were clear and explicit, lacking any language that reserved any mineral interest. Saheid submits that the “vague language” of these documents did not establish any reservation of minerals, and he made four years of royalty payments in error.
By his second assignment of error, Sa-heid urges the court committed manifest error in finding Gish’s testimony credible to support the finding that he retained a 12 ½% mineral interest in the property sold to Saheid. He argues that Gish’s testimony was unsupported by any documentation and too inconsistent to justify the court’s findings.
On close examination, the transfer documents show ambiguity not normally found in a transaction of this size. The Agreement refers to Gish as seller and Saheid as buyer, and to a “real estate transaction involving 1,096 acres, including all oil and gas leases,” but lacks the standard phraseology of “grant, bargain, sell, convey,” and includes the peculiar clause that Gish would “give best effort to deliver to buyer the remaining 12 ½% Gish family oil and gas lease holding.” The Act of Credit Sale names Gish and his family trust without referring to them as sellers; with slightly better clarity it identifies Sa-heid as the purchaser and recites that Gish (alone) “does * * * grant, bargain, sell, convey, transfer, set over, assign and deliver” the tract of land and mineral rights. However, Paragraph K states that the trust and Saheid agree that the trust owns only 87.5% interest in the mineral leases assigned herein, a point that would seem unnecessary if Gish |]2were the seller, as suggested earlier in the document. Finally, the Contract refers to Gish and his wife as the sellers (no mention of the family trust), to Saheid as the buyer, and to the Act of Credit Sale, but states in Paragraph 2(d) that Saheid consented and acknowledged that he would continue to withhold two 6.25% royalty payments.
While we agree with Saheid’s position that these documents do not make an express reservation of mineral rights, we also find that the recurrent reference to a 12 ⅜% interest — be it “remaining,” “withheld,” or inferred from the recital that the seller owned only 87 ½% — just as strongly suggests that Gish did not intend to sell, and Saheid did not intend to buy, the entire mineral interest. In short, the district court did not commit legal error in finding the documents ambiguous and using parol evidence to interpret them.[2] The first assignment of error lacks merit.
To interpret these ambiguous documents, the district court heard four live witnesses. This court has already summarized their testimony; our duty is to decide whether the district court’s interpretation of their testimony was reasonable. Gish testified that he initially intended to sell the entire tract, including mineral rights, for $4 million, but when Saheid was unable to get financing, he agreed to $400,000 off the purchase price, owner financing, and selling only 87 ⅜% of the minerals. David, the broker, confirmed that Gish was selling 100% of the tract and 87 ½% of the minerals. Reservation of a portion of the minerals is a reasonable concession for accepting a partial payment and owner financing. Moreover, Saheid paid Gish the mineral 11sroyalty for nearly four years, strongly suggesting that the reservation was the parties’ intent.
On the other hand, Saheid testified he was unfamiliar with Louisiana property *994 law and “confused” when he went to New Orleans, he was unaware of the 12 ⅜% retention and never intended to -buy less than the entire mineral interest. However, he admitted paying the royalty for nearly four years, until April 2008, halting payment only when he wanted to lease the minerals.[3] On these facts and circumstances, the district court did not abuse its discretion in discounting Saheid’s claimed intent.
A large portion of Saheid’s testimony, and a major theme of his argument on appeal, is that Gish repeatedly said other family members, or the family trust, owned the disputed 12 ½%, and thus he could not sell it; when the title examination showed no such separate' interest on the public record, Saheid felt he was entitled to 100%. Saheid’s expert, Huguet, confirmed that no separate interest was recorded. However, the district court found that the transfer documents were ambiguous and that extrinsic evidence would be needed to discern the parties’ true intent. The court found, based on the overall structure of the transaction, the recurring reference to a separate 12 ½% interest, and Saheid’s history of paying royalties,, the intent was for Gish to sell, and Saheid to buy, 87 ½% mineral interest, a completely legal result. La. R.S. 31:15. Gish’s evolving explanation for retaining 12 ⅜%, and • Sa-heid’s imperfect understanding | uthereof, are simply irrelevant and definitely do not violate Louisiana public records doctrine.
The district court committed no manifest error in interpreting the parol and other evidence to find that Gish sold, and Saheid bought, 87 ½% of the mineral interest. The second assignment of error lacks merit.

Expansion of the Pleadings

' By his third assignment of error, Saheid urges the court committed legal error in allowing Gish to amend or enlarge the pleadings in the middle of trial. In the petition, Ms. Shepard and the Kennedys (Gish’s mother and sister) alleged they owned the 12 ½%; at trial, Gish said he owned it. Saheid shows that the petition must name the true claimants, La. C. C. P. art. 891, and the petition must be amended to conform to the evidence, La. C. C. P. art. 1154. He . contends that “trial by ambush” is not allowed, Teasley v. Ates, 2003-824 (La.App. 3 Cir. 12/10/03), 861 So.2d 778, writ denied, 2004-0092 (La. 3/19/04), 869 So.2d 855, a timely objection precludes such amendment, Burns v. Interstate Brands Corp., 2009-705 (La.App. 3 Cir. 2/3/10), 30 So.3d 271, and that equitable estoppel prevents a claimant from shifting to “another right, remedy or option” to the detriment of the opponent, Barnco Int’l v. Arkla Inc., 628 So.2d 162 (La. App. 2 Cir. 1993), writ denied, 94-0397 (La. 4/4/94), 635 So.2d 1105. Saheid shows that he objected timely to the ex pansion of the pleadings and the court should not have allowed Gish to prove that somebody other than Ms. Shepard and the Kennedys owned the contested 12 ½%. He concludes that because of this error, the judgment should be reversed and the case dismissed.
The law expressly permits expansion of the pleadings to conform' to the evidence. La. C. C. P. art. 1154. Even when the affected party objects, hfithe court may permit amendment if so doing aids the presentation of the evidence and *995 does not prejudice the other party. Brantley v. Kaler, supra. Construction with other matters at trial, and fair notice, are key to allowing expansion. Boudreaux v. Boudreaux, supra.
On this record, we find no abuse of the district court’s discretion. The issue of the 12 ⅜% mineral interest was alleged in the petition and in every subsequent pleadings and hearing. There was never any attempt to claim a different right, remedy or option, as criticized in Barnco Int'l v. Arkla Inc., supra. It is disingenuous for Saheid to contend that he was surprised or “ambushed” by Gish’s position at trial. In addition, there is no showing that Saheid was prejudiced by the expanded pleadings. He offered the testimony of an expert, Hu-guet, who found no separate mineral interest in the public records; this defense would be exactly the same whether the interests were claimed by Gish, his sister, his mother or the family trust. Finally, Huguet admitted that as full owner, Gish could sell whatever portion he desired; to deny expansion of the pleadings would effectively block him from asserting his interest. The third assignment of error lacks merit.

No Right of Action

By his fourth assignment of error, Saheid urges the court committed legal error in denying his exception of no right of action, as Gish had no right to pursue claims that belonged to the Kennedys, parties who were dismissed. The argument mirrors that in the third assignment, adding that evidence is admissible on trial of the exception of no right of action, La. C. C. P. art. 931, and once the Kennedys were dismissed, the evidence showed that only Ms. Shepard had any interest. From this, Saheid submits l1Bthe judgment should be amended to reflect only Ms. Shepard’s 6 ⅜% interest.
Only a person having a real and actual interest to assert may bring an action. La. C. C. P. art. 681; Eagle Pipe & Supply Inc. v. Amerada Hess Corp., supra. The burden of proof at trial of the exception is on the person raising the exception. Wagner v. Chevron USA Inc., supra. Evidence is admissible at trial of the exception. La. C. C. P. art. 931; Industrial Cos. Inc. v. Durbin, supra.
The district court referred the exception to the merits, as allowed by Art. 931. After finding the transfer documents ambiguous, the court heard parol and extrinsic evidence to ascertain the parties’ true intent, ultimately finding that Gish was the full owner of the property and agreed to sell 87 ⅜% of the mineral interest. From this it follows that Gish was the proper person to seek a declaration of the ownership of the contested 12 ⅜%. The court committed neither legal nor factual error in finding Gish had a real and actual interest. The fourth assignment of error lacks merit.

Conclusion

For the reasons expressed, the judgment is affirmed. Mohamed “Jack” Saheid is to pay all costs,
AFFIRMED.

. In a nutshell: ownership of real property is determined from the public records, La. C.C. art. 3338; a transfer is effective against third parties only from the date of filing in the public records, La. C.C. art. 1839; this princi-pie applies to mineral rights, Ogden v. Ogden, 93-1413 (La.App. 3 Cir. 9/21/94), 643 So.2d 245, writ denied, 94-2539 (La. 1/13/95), 648 So.2d 1339.

. We note that in opposition to Gish’s motion for summary judgment, Saheid argued that the Contract “is ambiguous about what is given and who is to receive it,” precisely the conclusion he is now contesting on appeal.

. This court would take judicial notice that March 2008 marked the beginning of the land-leasing boom associated with the Haynesville Shale formation. Ferrara v. Questar Expl. & Prod. Co., 46,357 (La.App. 2 Cir. 6/29/11), 70 So.3d 974, 181 Oil & Gas Rep. 913, writ denied, 2011-1926 (La. 11/14/11), 75 So.3d 943; Yates v. Marston, 48,009 (La.App. 2 Cir. 5/22/13), 121 So.3d 673.