MOORE, J.
River Cities Disposal Co. Inc. ("RCDC") appeals a declaratory judgment recognizing that the estate of its former consultant, Jim Lynch, had an ownership interest of 14½% of the net revenue from RCDC's marketing agreement with Browning-Ferris Industries ("BFI"). For the reasons expressed, we affirm.
FACTUAL BACKGROUND
In the 1980s, the City of Shreveport built the new Woolworth Road landfill. Local produce distributor Tony Pernici, his grandsons Scott and Rick Pernici, and other investors (John Caruthers, Taylor Moore, David Watkins, Al Otto) formed a startup company, River Cities Waste Inc. ("RCW"), in 1986, to haul solid waste to Woolworth Road. The Pernicis owned a lot of trucks, but had no experience in the field of solid waste, so they turned to several consultants, including Jim Lynch, previously the city's director of public works. RCW developed a small business, principally hauling for the Pernicis' established customers.
The city eventually solicited proposals from solid waste companies to operate Woolworth Road. RCW contacted BFI, an industry leader, and struck a deal. Shareholders of RCW formed a new corporation, RCDC, in March 1987, to execute a landfill marketing agreement ("the marketing agreement") with BFI. Under the marketing agreement, RCDC was to receive 10% of BFI's gate revenues at Woolworth Road. RCDC thus became the principal solid waste hauler for Shreveport.
Everyone recognized that Lynch's experience and connections in the industry were instrumental in the formation of RCW and in securing the contract with BFI. Rather than paying him up-front for his services, the shareholders agreed to pay Lynch a percentage of RCDC's net revenue under the marketing agreement. They wrote him the following letter ("the letter agreement"), on RCW letterhead, on October 12, 1987:
This letter will serve as evidence of your ownership of 14½% of our net revenues from our Shreveport landfill marketing agreement with BFI, Inc.
*217 The letter agreement was signed by Scott Pernici, president, and John D. Caruthers Jr., secretary/treasurer, and RCDC began paying Lynch the 14½% monthly.
Lynch was, at the time, seriously ill with emphysema, as RCDC's shareholders were fully aware. He died in March 1989, having received about $24,000 from the letter agreement. RCDC continued making the monthly payments, to his widow, Carolyn Lynch; until her death, in 2012, she had received about $2 million from RCDC. Evidence at trial showed that RCDC treated these payments, for tax purposes, as commissions, management fees, consulting fees, or royalties to nonowners, all deductible as necessary and ordinary business expenses. Carolyn treated them as taxable income.
In 2008, Carolyn's CPA, George McGovern, noticed that the RCDC payments were the largest asset in her estate. With her consent, he emailed RCDC's attorney, Michael Wainwright, asking for documentation of her 14½% ownership "in the landfill." Wainwright replied that Lynch never owned "any interest in" RCDC, the 14½% payment was a "fee" to Lynch, after his death the shareholders "decided to voluntary [sic ] continue" making those payments to Carolyn, and RCDC intended to continue making the payment "during her lifetime[.]" McGovern replied by email, "You have resolved an issue we were having regarding her estate. * * * I believe she is very content with the current arrangement." Carolyn died in June 2012, and RCDC immediately stopped sending the money, which was by then about $12,000 a month.
PROCEDURAL HISTORY
Ms. Hansen, Carolyn's daughter and executrix, and the other children filed this suit for declaratory judgment in May 2013, seeking recognition of their ownership of 14½% interest. RCDC countered that all payments made to Lynch, and later to Carolyn, were donations, and lacked lawful cause; it filed a motion for summary judgment to this effect, which the district court granted.
On appeal, this court found genuine issues of material fact as to the "cause of the contract as it bears on the classification of the payments[.]" While noting that the district court found the letter agreement ambiguous, this court was "not as certain about the equivocality of the letter" but, if it was truly ambiguous, the court "erred in making its determination that there were no genuine issues of material fact." We reversed and remanded. Hansen v. River Cities Disposal Co. , 49,968 (La. App. 2 Cir. 8/12/15), 174 So.3d 1203, writ denied , 2015-1657 (La. 10/30/15), 180 So.3d 301.
The parties proceeded to trial over two days in September 2016. The plaintiffs called George McGovern, Carolyn's CPA. He testified that the "royalty payment" from RCDC was listed as an asset of Lynch's estate, and that in 2008 he asked RCDC's attorney, Wainwright, to confirm Carolyn's 14½% interest "in the landfill." McGovern did not agree that RCDC's payments to Carolyn were "voluntary," but testified that she was satisfied to hear that she would continue to receive them. Robert Busby, RCDC's CPA, testified that the corporation had treated payments to Carolyn as necessary and ordinary business expenses, and deducted them accordingly.
The plaintiffs called Scott Pernici on cross-examination; he gave a long account of the genesis of RCW and RCDC, describing Lynch's advice in the early days as "valuable." He testified that RCDC did not pay a salary to most of its consultants (although it made lucrative business deals with some), and was aware that it later *218 started paying Lynch. Scott claimed he was totally unaware of the letter agreement, did not recall signing it, and saw it for the first time only when this litigation started, but he admitted the signature on it was his own. Scott's brother Rick, also called on cross-examination, similarly claimed to be totally unaware that the letter agreement existed.
The plaintiffs also called John Caruthers Jr., on cross-examination, an 87-year-old retired attorney who had invested in RCW back in 1986. He had been "most impressed" with Lynch's political skills and considered him a "valuable asset" to the business. In 1987, the shareholders wanted to compensate Lynch, but RCDC did not yet have a return on capital, so all agreed to reduce their shares of the net from the marketing agreement to give Lynch a share similar to their own, 14½%. Caruthers admitted signing the letter agreement and said he considered it valid for as long as RCDC was getting money under the marketing agreement. He was adamant that Lynch did not receive any actual ownership of the corporation, and was surprised that he (Lynch) told his CPA otherwise. He felt that the shareholders wanted to take care of Carolyn, and not her kids 25 years later.
RCDC called its attorney, Michael Wainwright, who testified that he had drafted all assignments and transfers of interest in the corporation. He insisted, however, that he did not draft the letter agreement, and was unaware of it until it turned up in discovery. He admitted, nevertheless, that RCDC had paid Lynch, and then Carolyn, a "consulting fee." He felt that the payments to Carolyn were voluntary, and he was opposed to continuing them, but the older shareholders wanted to "live up to" their agreement. He also testified that because of the response from McGovern in 2008, he advised RCDC to take no legal action regarding the status of the payments to her. Finally, he considered the letter agreement just a letter, not an agreement.
RCDC (as well as the plaintiffs) offered the deposition of David Watkins, one of the original shareholders of RCW and a current shareholder of RCDC. He was just a passive investor, but he considered Lynch a "valuable consultant" who taught them the business. He said the shareholders agreed to keep on paying the 14½% after Lynch's death, but did not discuss how long they would continue doing so. When shown the letter agreement, he said, "I thought we made a mistake there, but there was never any question about living with it." RCDC also offered the deposition of Julie Otto, the widow of another original shareholder, Al Otto. She was adamant that Lynch had no actual ownership interest in RCW or RCDC, and thought that after Carolyn died, "the rest would be split up and everyone would agree."
On direct examination, Scott Pernici reiterated that Lynch had made no capital investment in RCW or RCDC, but that the companies agreed to pay him for consulting services. Scott expected payments to end when Lynch died, but his grandfather and other older shareholders told him to continue paying Carolyn; he viewed this as a "second agreement," and not as a "heritable right." He testified he was "shocked" by McGovern's query in 2008, and would have filed suit to clarify Carolyn's interest, but refrained from taking any action when she told McGovern she was "satisfied" with the current arrangement. Finally, he said that Carolyn was now receiving more compensation than any shareholder.[1]
*219 ACTION OF THE DISTRICT COURT
The district court wrote a six-page ruling, finding that the letter agreement constituted an act under private signature, La. C.C. art. 1838 ; that no testimonial or other evidence was admissible to disprove it, La. C.C. art. 1848 ; that it clearly conveyed to Lynch, with no limitations, 14½% ownership of the revenue stream from BFI to RCDC; and that parol evidence suggesting that it meant anything else was inadmissible. The court cited RCDC's tax returns to reject the argument that the corporation made years of voluntary payments to Carolyn, and found no evidence that the parties ever modified the letter agreement, such as to limit it to Carolyn's lifetime. Finally, the court rejected the argument that McGovern's emails in 2008 constituted equitable estoppel, as RCDC did not prove a change in position, only a decision to take no action.
The court rendered judgment recognizing the estate's ownership in 14½% of the net revenue from the marketing agreement for as long as that agreement remains in existence, awarding a lump sum of $581,883 for amounts unpaid from July 2012 through September 2016, and ordering RCDC to make all future payments on the first of each month after the revenue is received.
RCDC has appealed suspensively, raising seven assignments of error.
DISCUSSION
Law of the Case
By its first assignment of error, RCDC urges the court erred in finding the intent of the parties solely in the text of the letter agreement, when the Second Circuit had "already ruled otherwise." RCDC cites a passage from this court's opinion ("Such a determination [the intent of the parties] can not be made on affidavits but can only be determined after trial") and argues that this constitutes law of the case, Day v. Campbell-Grosjean Roofing & Sheet Metal Corp. , 260 La. 325, 256 So.2d 105 (1971). It concludes that this court's prior ruling is binding on the parties and the district court, and obligated the district court to consider testimonial evidence.
The "law of the case" principle is a discretionary guide which relates to the binding force of a trial judge's ruling during the later stages of trial, to the conclusive effects of appellate rulings at trial on remand, and to the rule that an appellate court ordinarily will not reconsider its own rulings of law on a subsequent appeal in the same case. McElroy v. Continental Cas. Co. , 43,868 (La. App. 2 Cir. 6/24/09), 15 So.3d 377, and citations therein . It has no application when an appellate court reviews a ruling of the district court. Id. ; Landry v. Aetna Ins. Co. , 442 So.2d 440 (La. 1983). When a district court denies summary judgment, or an appellate reverses one, on grounds that there are still genuine issues of material fact, law of the case does not attach. McElroy v. Continental Cas. Co. , supra ; Edwards v. Larose Scrap & Salvage Inc. , 2011-1412 (La. App. 3 Cir. 4/4/12), 89 So.3d 1227, writ denied , 2012-1510 (La. 10/12/12), 98 So.3d 870 ; State v. National Union Fire Ins. Co. of La. , 2010-0689 (La. App. 1 Cir. 2/11/11), 56 So.3d 1236, writ denied , 2011-0849 (La. 6/3/11), 63 So.3d 1023.
This court reversed the summary judgment because we found genuine issues of material fact-specifically, if the letter was *220 (as the district court found) ambiguous, how could it be clear enough to defeat the plaintiffs' claim, without the admission of extrinsic evidence? We added that "we are not as certain [as the district court] about the equivocality of the letter," but did not make a factual finding that it was (or was not) ambiguous. Our prior opinion provides no basis to apply the discretionary principle of law of the case. This assignment of error lacks merit.
Finding of Act Under Private Signature
By its second assignment of error, RCDC urges the court erred in finding the letter agreement was a contract in the form of an act under private signature. A contract must create, modify or extinguish an obligation, La. C.C. art. 1906, but the letter agreement was explicitly only "evidence of your ownership," and, according to RCDC, does not purport to be a contract. RCDC concedes that lawful cause need not be stated, La. C.C. art. 1969, but argues that the letter agreement's silence as to cause makes it not a contract, but, rather, "essentially, a receipt-evidence of a prior transaction between the parties." RCDC concludes that a receipt is not a contract and is not an act under private signature just because somebody signed it.
The act under private signature is not explicitly defined in the Civil Code, but its meaning is apparent from the context, Book III, Title III, Chap. 5, "Proof of Obligations." The law requires certain contracts to be in written form, La. C.C. art. 1832. The preferred written form is the authentic act-one executed before a notary public or other authorized officer, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed. La. C.C. art. 1833. An authentic act constitutes "full proof" of the agreement, and is also considered self-proving. La. C.C. art. 1835 ; C.C.P. art. 2636 ; Louisiana Nat'l Bank of Baton Rouge v. Heroman , 280 So.2d 362 (La. App. 1 Cir.), writ denied , 281 So.2d 755 (1973). However, an act that fails to be authentic because of lack of competence or capacity of the notary, or because of a defect of form, may still be valid as an act under private signature. La. C.C. art. 1834 ; 6126, LLC v. Strauss , 2013-0853 (La. App. 4 Cir. 12/4/13), 131 So.3d 92, writ denied , 2014-0001 (La. 2/28/14), 137 So.3d 15 ; Neck v. Neck , 169 So.2d 401 (La. App. 3 Cir. 1964). One court has even held that wooden stakes, bearing the handwritten inscription "In 1936 this Lot 4 sold to Silas Griffin by L. J. Pierce," and hammered into the four corners of the lot, constituted an act under private signature. Pierce v. Griffin , 95 So.2d 190 (La. App. 3 Cir.), writ denied , (1957, not reported).
An act under private signature is regarded "prima facie as the true and genuine act of a party executing it when his signature has been acknowledged, and the act shall be admitted in evidence without further proof." La. C.C. art. 1836. A party against whom an act under private signature is asserted must acknowledge his signature or deny that it is his. La. C.C. art. 1838. An act under private signature need not be written by the parties, but must be signed by them. La. C.C. art. 1837. For an assignment, there is no requirement of authentic form or that the assignee sign; it is sufficient for the assignor to sign, and acknowledge his signature, for the instrument to constitute an act under private signature duly acknowledged. Louisiana Mobile Imaging Inc. v. Ralph L. Abraham Jr. Inc. , 44,600 (La. App. 2 Cir. 10/14/09), 21 So.3d 1079 ; Meyer v. Ullo , 627 So.2d 226 (La. App. 4 Cir. 1993).
The letter agreement qualifies as an act under private signature because it reflects RCDC's assignment to Lynch of *221 14½% interest in the net revenues from the marketing agreement with BFI. It was signed by two corporate officers, Scott Pernici and John Caruthers, both of whom acknowledged their signatures. The district court did not commit manifest error in admitting it in evidence without further proof, under La. C.C. art. 1836. There is no merit in RCDC's argument that the document cannot qualify as an "act" because it does not contain language of conveyance, only "evidence of your ownership." The meaning is perfectly clear, and no special form or words are required to constitute a valid assignment. Aetna Life Ins. Co. v. Lama Trusts , 28,328 (La. App. 2 Cir. 5/8/96), 674 So.2d 1086, writ not cons. , 96-1502 (La. 9/13/96), 679 So.2d 100 ; Colonial Fin. Serv. v. Stewart , 481 So.2d 186 (La. App. 1 Cir. 1985). This assignment of error lacks merit.
Interpretation of the Letter Agreement
By its third assignment of error, RCDC urges the court erred in finding that the parties intended to convey from RCDC to Lynch a heritable 14½% ownership in the revenue from the BFI marketing agreement. Citing the testimony of Caruthers and the deposition of David Watkins, senior shareholders, RCDC argues that the only intent was to give Lynch a "stipend" for past, present and future consulting services. Citing these witnesses, and Scott Pernici and Julie Otto, RCDC further contends that, shortly before his death, Lynch approached the shareholders and asked them to continue payments to Carolyn after he died-a request that would have been unnecessary if the letter agreement had truly conveyed a heritable interest to him. The shareholders agreed to continue payments as a "favor" to Lynch, never dreaming they had given away a heritable interest in their vital revenue. By its fourth assignment, RCDC urges the court erred in requiring it to prove that the "original contract" was validly modified by a subsequent oral agreement.
The interpretation of contracts is the determination of the common intent of the parties. La. C.C. art. 2045 ; Olympia Minerals LLC v. HS Resources Inc. , 2013-2637 (La. 10/15/14), 171 So.3d 878 ; Kennedy v. Saheid , 51,044 (La. App. 2 Cir. 11/16/16), 209 So.3d 985, writ denied , 2016-2241 (La. 1/23/17), 215 So.3d 681. Courts give the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. La. C.C. art. 2047. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. C.C. art. 2046 ; Mack Energy Co. v. Expert Oil & Gas LLC , 2014-1127 (La. 1/28/15), 159 So.3d 437 ; Kennedy v. Saheid , supra . Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature; however, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or that the written act was modified by a subsequent and valid oral agreement. La. C.C. art. 1848 ; McCarroll v. McCarroll , 96-2700 (La. 10/21/97), 701 So.2d 1280 ; Driver Pipeline Co. v. Cadeville Gas Storage LLC , 49,375 (La. App. 2 Cir. 10/1/14), 150 So.3d 492, writ denied , 2014-2304 (La. 1/23/15), 159 So.3d 1058. Although parol evidence is inadmissible to vary the terms of a written contract, when the terms thereof are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language used, then parol evidence is admissible to clarify the ambiguity and show the true intent of the parties.
*222 McCarroll v. McCarroll , supra ; Driver Pipeline Co. v. Cadeville Gas Storage , supra .
The case boils down to the interpretation of the one sentence that comprises the letter agreement: "This letter will serve as evidence of your ownership of 14½% of our net revenues from our Shreveport landfill marketing agreement with BFI, Inc." The word used is ownership , which means direct, immediate and exclusive authority over a thing. La. C.C. art. 477. There is no qualification that Lynch's right is actually a stipend, commission, management fee, consulting fee or royalty to a nonowner. It is not made subject to any resolutory condition or term, as it might have been under La. C.C. arts. 478 and 1777. Nothing in the words of the letter agreement indicates that when it was executed, the parties intended that RCDC would pay the 14½% only for the duration of Lynch's, or of his widow's, life. The district court did not err in its interpretation of the letter agreement. This assignment of error lacks merit.
Further, the district court correctly stated that the burden is on the party claiming the modification of a written agreement to show it, by a preponderance of the evidence. Balser v. Shreveport Oil Co. , 163 La. 1008, 113 So. 356 (1927) ; Autovest LLC v. Nash , 50,725 (La. App. 2 Cir. 6/22/16), 197 So.3d 258, writ denied , 2016-1644 (La. 11/18/16), 210 So.3d 292. RCDC argued principally that the letter agreement conferred only a stipend, and offered parol testimony to prove that the parties modified this to extend the stipend through the lifetime of Lynch's widow, Carolyn. However, the court found that the letter agreement actually assigned Lynch ownership of 14½% net revenue, and RCDC adduced not one scintilla to prove that the parties agreed to reduce this to some conditional or temporary right. This assignment of error lacks merit.
Admissibility of Certain Testimony
By its fifth assignment of error, RCDC urges the court erred in finding that testimony regarding the intent of the parties was inadmissible parol evidence. RCDC reiterates that the letter agreement was not an act under private signature, but merely evidence of a prior verbal agreement, and thus the only way to prove the entire agreement was by the use of parol evidence. In support, it cites United Investors Life Ins. Co. v. Alexander , 27,466 (La. App. 2 Cir. 11/1/95), 662 So.2d 831. By its sixth assignment, RCDC urges the court erred in finding that Scott Pernici's testimony regarding his conversations with Lynch was inadmissible hearsay. Scott conceded that he did not know how the shareholders reached the 14½% expressed in the letter agreement, but maintained he had a clear recollection of the overall agreement. RCDC contends that his testimony was admissible to prove the fact that the conversations took place, not for the truth of their content, citing Frank L. Maraist, Evidence & Proof , 2 ed., § 10.1 (19 La. Civ. L. Treatise, Thomson West ©2007).
These assignments are premised on the argument that the letter agreement was not, after all, an act under private signature. Since we have affirmed the district court's finding that it was, RCDC has no recourse to parol evidence. La. C.C. art. 1848 ; McCarroll v. McCarroll , supra ; DriverPipeline Co. v. Cadeville Gas Storage , supra . In United Investors Life Ins. Co. v. Alexander , supra , this court affirmed the use of testimony to show that the "written agreement is incomplete and not intended by the parties to exhibit the entire agreement." United Investors , however, involved an insurance policy that designated *223 only contingent beneficiaries, but no primary beneficiary: this gaping absence could be closed only by extrinsic, testimonial evidence. There is no such ambiguity in the letter agreement. Finally, Scott's testimony about conversations with Lynch may have been relevant to prove that the conversations took place, but it was offered primarily to show that the parties really intended something other than the text of the letter agreement. In short, it was an attempt to prove the truth of the matter asserted, defined as hearsay in La. C.E. art. 801 C, and generally inadmissible as evidence, La. C.E. art. 802. It was also inadmissible to negate or vary the terms of the letter agreement, La. C.C. art. 1848. This assignment of error lacks merit.
Equitable Estoppel
By its final assignment of error, RCDC urges the plaintiffs' claims were barred by equitable estoppel. The elements of equitable estoppel are a representation by conduct or word, justifiable reliance, and a change in position to one's detriment because of such reliance. Wilkinson v. Wilkinson , 323 So.2d 120 (La. 1975). On behalf of RCDC, Wainwright wrote to Carolyn's CPA, McGovern, that he considered RCDC's payment to be purely voluntary, and McGovern, on behalf of Carolyn, replied that "she is very content with the current arrangement." RCDC contends that this representation induced it to take no action to clarify the true nature of the payments, to its detriment. RCDC concludes that the declaratory judgment should be reversed and the plaintiffs' claims dismissed.
The doctrine of equitable estoppel is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations or silence. Luther v. IOM Co. LLC , 2013-0353 (La. 10/15/13), 130 So.3d 817. To prove detrimental reliance, a party must prove, by a preponderance of the evidence, a representation by conduct or word, justifiable reliance, and a change to one's detriment because of the reliance. Id. ; Wilkinson v. Wilkinson , supra . Estoppels are not favored in our law; therefore, a party cannot avail himself of that doctrine unless he proves all essential elements of the plea. Luther v. IOM Co. , supra ; Magee v. Worley , 49,653 (La. App. 2 Cir. 3/4/15), 163 So.3d 23. Proof of an actual change in position is required. A party may justifiably rely on another's conduct or representations, but if he makes no change in his own conduct, takes no action in response, he fails to prove equitable estoppel. Wilkinson v. Wilkinson , supra ; Magee v. Worley , supra ; Pierce v. Pierce , 397 So.2d 62 (La. App. 2 Cir. 1981) ; Ciolino v. First Guaranty Bank , 2012-2079 (La. App. 1 Cir. 10/30/13), 133 So.3d 686.
RCDC's attorney, Wainwright, testified that because of the response from McGovern in 2008, he recommended that RCDC take no legal action regarding the status of payments to Carolyn. Scott Pernici testified that although his reaction to the initial query was to file suit to clarify Carolyn's interest, McGovern's response led him to "refrain from doing that." RCDC made no change until it discontinued payments, in 2012, immediately after Carolyn's death. In short, RCDC did not prove any change in conduct or action in response to McGovern's email; on the contrary, it proved inaction. There is no basis to apply equitable estoppel. Wilkinson v. Wilkinson , supra ; Magee v. Worley , supra ; Pierce v. Pierce , supra ; Ciolino v. First Guaranty Bank , supra . This assignment lacks merit.
CONCLUSION
For the reasons expressed, the judgment is affirmed. All costs are to be paid *224 by the appellant, River Cities Disposal Company Inc.
AFFIRMED .

Scott also testified, by proffer, that shortly before his death, Lynch had pleaded with him to persuade the other shareholders to "pay Carolyn what we would have paid him just like if he was still alive."